1  DENNIS P. GALLAGHER, II, ESQ. - SBN 301453
   Wm. Bolthouse Farms, Inc.
2  7200 E. Brundage Lane
   Bakersfield, CA  93307
3  Tel: (661) 477-6579
   Matthew.Ayres@bolthouse.com
4  Dennis.Gallagher@bolthouse.com

5  Attorneys for Plaintiff,
   WM. BOLTHOUSE FARMS, INC.

6

7                    UNITED STATES DISTRICT COURT

8                   EASTERN DISTRICT OF CALIFORNIA

9                                * * *

10 WM. BOLTHOUSE FARMS, INC., a Michigan        **CASE NO.**
11 Corporation,                                 *Complaint filed:*
                                                *Trial Date: n/a*
12                 Plaintiff,

13        vs.                                    **COMPLAINT FOR DAMAGES**

14 ATKINSON STAFFING, INC., an Oregon           1. **Breach of Written Contract**
15 Corporation, and MESA UNDERWRITERS           2. **Breach of Written Contract**
   SPECIALTY INSURANCE COMPANY, an              3. **Express Indemnity**
16 Arizona Corporation, and                     4. **Implied Indemnity**
   DOES 1 through 50, inclusive,                5. **Partial Equitable Indemnity**
17                                              6. **Declaratory Relief**
                   Defendants.
18

19        COMES NOW, Plaintiff WM. BOLTHOUSE FARMS, INC., a Michigan Corporation

20 ("Plaintiff"), and complains against Defendants ATKINSON STAFFING, INC., an Oregon

21 Corporation ("Atkinson"), and MESA UNDERWRITERS SPECIALTY INSURANCE COMPANY,

22 an Arizona Corporation ("Mesa") (Atkinson and Mesa are collectively referred to as "Defendants")

23 (Plaintiff and Defendants are collectively referred to as the "Parties"), as follows:

24                       **PARTIES AND JURISDICTION**

25        1.     At all times herein mentioned, Plaintiff is and at all relevant times was, a corporation

26 organized under the laws of the state of Michigan with its principal place of Business in Kern County,

27 California.

28        2.     Plaintiff is informed and believes and based thereon alleges, that at all times herein

                                          1

mentioned, Defendant Atkinson is and at all relevant times was, a corporation organized under the laws of the state of Oregon and doing business in Benton County, Washington.

3. Plaintiff is informed and believes and based thereon alleges, that at all times herein mentioned, Defendant Mesa is and at all relevant times was, a corporation organized under the laws of the state of Arizona.

4. Plaintiff is unaware of the true names and capacities of Defendant sued herein as DOES 1 through 50, inclusive, whether individual, registered professional, corporate, associate or otherwise, and therefore sues those defendants by such fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes and thereon alleges that each such fictitiously named defendant is responsible in some manner for the occurrences herein alleged, and Plaintiff's damages as herein alleged were proximately caused by defendants' acts.

5. Plaintiff is informed, believes, and thereupon alleges, that at all times material herein, Defendants, and each of them, were an owner, co-owner, agent, representative, partner, and/or alter ego of its co-defendants, or otherwise acting on behalf of each and every remaining defendant and, in doing the things hereinafter alleged, were acting within the course an scope of their authorities as an owner, co-owner, agent, representative, partner, and/or alter ego of its co-defendants, with the full knowledge, permission and consent of each and every remaining defendants, each co-defendant having ratified the acts of the other co-defendants.

6. This Court has jurisdiction as the Parties are diverse, *i.e.* Plaintiff's place of incorporation is different than that of each Defendant, and the amount in controversy exceeds $75,000.00.

7. Venue is appropriate as Plaintiff and Atkinson agreed to this Court as the appropriate venue for any dispute arising from the contract between the two which is the subject of this action (see paragraphs 10-12 below as well as Exhibit B attached hereto).

## GENERAL ALLEGATIONS

8. On or about January 27, 2015, Mesa issued a Commercial General Liability policy to Atkinson, policy no. MP0036002002040 (the "Mesa Policy"). Plaintiff was named as an additional insured party under the Mesa Policy and Additional Insured Endorsement. A true and correct copy of the Mesa Policy and Additional Insured Endorsement listing Plaintiff as an additional insured party are

attached hereto as Exhibit A.

9.    The Mesa Policy provides insurance coverage for bodily injury and property damage. (See Section I- Coverages.) The Amended Section II provides that the additional insured (Plaintiff) is insured under the policy for bodily injury "caused, in whole or in part, by: 1. Your acts or omissions; or 2. The acts or omissions of those acting on your behalf; in the performance of your ongoing operations for the additional insured(s) and the location(s) designated above."

10.    On or about June 2, 2015, Plaintiff and Atkinson entered into a Services Agreement whereby Atkinson would provide services and labor to Plaintiff in exchange for monetary compensation (the "Services Agreement"). A true and correct copy of the Services Agreement is attached hereto as Exhibit B.

11.    Section 19 of the Services Agreement provides:

> "[Atkinson] will indemnify, defend, and hold [Plaintiff] and its affiliates…
> harmless against any and all costs, losses, damages or expenses (including
> reasonable attorney's fees) that any of them may incur or be subjected to
> by reason of any claim, demand, or suit arising out of [Atkinson]'s
> performance of the Services set forth in this Agreement, or by reason of
> any act or omission of [Atkinson] or any of its employees, contractors or
> agents."

12.    Section 20 of the Services Agreement required Atkinson to maintain an insurance policy for commercial general liability coverage in conjunction with the Services Agreement, *to wit* the Mesa Policy.

13.    On or about April 16, 2018, David Licona Lara ("Lara") filed a Complaint for Damages (the "Lara Complaint") in Benton County Superior Court in the State of Washington, case number 18-2-00978-0 (the "Lara Action"). A true and correct copy of the Lara Complaint is attached hereto as Exhibit C.

14.    The Lara Complaint makes the following allegations[1]:

---

[1] Plaintiff's recitation of facts relating to the Lara Action herein are provided as allegations against Plaintiff and are not

3

COMPLAINT

a. In July of 2015, Lara was employed by Atkinson.

b. On July 7, 2015, Atkinson assigned Lara as a temporary worker to work at Plaintiff's facility located in Prosser, Washington.

c. While working at Plaintiff's facility on this date, Lara's jacket became caught on a pick wheel, pulling Lara into the conveyor belt system and causing him to sustain serious bodily injuries.

d. Lara claims he and others were improperly and insufficiently trained.

15. On or about May 10, 2018, John Volock, Jr. ("Volock"), a Claims Professional for Travelers Insurance Company, Plaintiff's insurance company, transmitted an email to Mesa. Therein, Volock requested that Mesa, as insurer for Atkinson, defend, indemnify and hold harmless Plaintiff in the Lara Action, pursuant to the Mesa Policy (the "Mesa Tender Request"). A true and correct copy of the Mesa Tender Request is attached hereto as Exhibit D[2].

16. On or about May 14, 2018, Mesa responded to Volock via letter. Therein, Mesa denied the Mesa Tender Request, refusing to defend or indemnify Plaintiff in the Lara matter, despite the Mesa Policy (the "Mesa Tender Denial"). A true and correct copy of the Mesa Tender Denial is attached hereto at Exhibit E.

17. On or about May 31, 2018, William Spencer, counsel for Plaintiff, transmitted written correspondence to Atkinson. Therein, Spencer requested that Atkinson, defend, indemnify and hold harmless Plaintiff in the Lara Action, pursuant to the Services Agreement (the "Atkinson Tender Request"). A true and correct copy of the Atkinson Tender Request is attached hereto as Exhibit F.

18. On or about December 3, 2018, Atkinson responded to Plaintiff via letter. Therein, Atkinson denied the Atkinson Tender Request, refusing to defend or indemnify Plaintiff in the Lara matter, despite the Services Agreement (the "Atkinson Tender Denial"). A true and correct copy of the Atkinson Tender Denial is attached hereto at Exhibit G.

19. Due to Defendants' refusal to defend, indemnify and hold harmless Plaintiff, Plaintiff has incurred the following damages:

---

admitted as true by Plaintiff.

[2] The Mesa Tender Request had three attachments which have been omitted from Exhibit D as they are already attached as Exhibits A and B hereto.

a. Plaintiff has sustained and will sustain attorneys' fees and costs in defending the Lara Action, amounts which are the responsibility of Defendants, and each of them, pursuant to the Mesa Policy and Services Agreement.

b. Although the Lara Action is ongoing, Lara has produced medical bills in excess of $100,000.00 and, upon information and belief, is seeking in excess of $1,000,000.00 in total damages.

**I**

**FIRST CAUSE OF ACTION**
**[Breach of Written Contract]**
**[Against Atkinson]**

20. Plaintiff incorporates by reference as if fully set forth herein the allegations of paragraphs one (1) through nineteen (19), above.

21. Plaintiff and Atkinson entered into the Services Agreement, a written contract set forth in Exhibit B, whereby Atkinson would provide defense and indemnity to Plaintiff of a claim or suit against Plaintiff relating to the Services Agreement.

22. Plaintiff fully performed its duties, obligations, and responsibilities under the Services Agreement relative to Lara and Atkinson.

23. Atkinson has failed to perform its duties, obligations, and responsibilities under the Services Agreement by refusing and failing to defend, indemnify and hold harmless Plaintiff in the Lara Action.

24. As a result of Atkinson's breach, Plaintiff has suffered and will continue to suffer damages by way of attorney's fees, expert fees, costs and discovery expenses in the Lara Action, and a potential settlement/adverse verdict in an amount according to proof through the date of entry of judgment. Plaintiff has also suffered and will continue to suffer damages in the instant action for attorney's fees, expert fees, costs and discovery expenses, damages to which Plaintiff is entitled under the Services Agreement and pursuant to *Civil Code* § 1717(a).

\\\
\\\
\\\
\\\

**II**

<u>**SECOND CAUSE OF ACTION**</u>
**[Breach of Written Contract]**
**[Against Mesa]**

25.     Plaintiff incorporates by reference as if fully set forth herein the allegations of paragraphs one (1) through twenty-four (24), above.

26.     Plaintiff was named as an additional insured under the Mesa Policy, a written contract set forth in Exhibit C, whereby Mesa would provide insurance coverage to Plaintiff and more particularly provide a defense as well as indemnification up to a certain amount for bodily injury.  Mesa also became contractually bound under the Services Agreement, para. 20.

27.     Plaintiff fully performed its duties, obligations, and responsibilities under the Services Agreement relative to Lara and Atkinson.

28.     Mesa has failed to perform its duties, obligations, and responsibilities under the Services Agreement by refusing and failing to defend, indemnify and hold harmless Plaintiff in the Lara Action.

29.     Mesa's refusal to defend and indemnify up to the policy limits Plaintiff is unreasonable and in bad faith due to the clear terms of the policy relating to an insured and defense thereof as well as the clear inapplicability of policy exclusions.

30.     As a result of Mesa's breach, Plaintiff has suffered damages by way of attorneys' fees and costs of suit in the Lara Action, and a potential settlement/adverse verdict in an amount according to proof through the date of entry of judgment.

**III**

<u>**THIRD CAUSE OF ACTION**</u>
**[Express Indemnity]**
**[Against Atkinson]**

31.     Plaintiff incorporates by reference as if fully set forth herein the allegations of paragraphs one (1) through thirty (30), above.

32.     The Services Agreement requires Atkinson to defend, indemnify and hold harmless Plaintiff in the event of bodily injury in connection with the Services Agreement.

33.     By way of the Lara Complaint and Lara Action, Lara claims he sustained bodily injury while in the course and scope of employment with Atkinson at Plaintiff's Washington facility.  These

allegations fall squarely within the purview of the Services Agreement.

34.     On May 31, Plaintiff gave written notice to Atkinson of the Lara Action against Plaintiff (the Atkinson Tender Request), requesting defense of the Lara Action by Atkinson and indicating that Atkinson would be bound under the Agreement to indemnify and hold harmless Plaintiff for any liability that Plaintiff might sustain as a result of the Lara Action.

35.     On December 3, 2018, Atkinson, through its legal counsel, transmitted the Atkinson Tender Denial, refusing to defend, indemnify and hold harmless Plaintiff.

36.     Plaintiff has incurred and will continue to incur attorney's fees, expert fees, costs and discovery expenses in the Lara Action.  The exact amount of said attorney's fees, expert fees, costs and discovery expenses incurred, or to be incurred, has not yet been ascertained.

**IV**

**FOURTH CAUSE OF ACTION**
**[Express Indemnity]**
**[Against Mesa]**

37.     Plaintiff incorporates by reference as if fully set forth herein the allegations of paragraphs one (1) through thirty-six (36), above.

38.     The Mesa Policy requires Mesa to defend and, to a certain monetary extent, indemnify Plaintiff in the event of bodily injury in connection with the Mesa Policy and underlying Services Agreement.

39.     By way of the Lara Complaint and Lara Action, Lara claims he sustained bodily injury while in the course and scope of employment with Atkinson at Plaintiff's Washington facility.  These allegations fall squarely within the purview of the Services Agreement.

40.     On May 31, Plaintiff gave written notice to Atkinson of the Lara Action against Plaintiff (the Atkinson Tender Request), requesting defense of the Lara Action by Atkinson and indicating that Atkinson would be bound under the Agreement to indemnify and hold harmless Plaintiff for any liability that Plaintiff might sustain as a result of the Lara Action.

41.     On December 3, 2018, Atkinson, through its legal counsel, transmitted the Atkinson Tender Denial, refusing to defend, indemnify and hold harmless Plaintiff.

42.     Plaintiff has incurred and will continue to incur attorney's fees, expert fees, costs and

discovery expenses in the Lara Action.  The exact amount of said attorney's fees, expert fees, costs and discovery expenses incurred, or to be incurred, has not yet been ascertained.

**V**

**FIFTH CAUSE OF ACTION**
**[Implied Equitable Indemnity]**
**[Against All Defendants]**

43.    Plaintiff incorporates by reference as if fully set forth herein the allegations of paragraphs one (1) through forty-two (42), above.

44.    If Lara sustained damages as alleged in the Lara Complaint and Lara Action, such damages were caused completely or partially by the primary and active negligence or fault of Atkinson and not by the secondary and passive conduct, if any, of the Plaintiff.  As such, Plaintiff is entitled to complete indemnification from Defendants, and each of them, for the satisfaction of any judgment, attorney's fees, and related expenses incurred in the defense of the Lara Action.

**VI**

**SIXTH CAUSE OF ACTION**
**[Partial Equitable Indemnity]**
**[Against All Defendants]**

45.    Plaintiff incorporates by reference as if fully set forth herein the allegations of paragraphs one (1) through forty-four (44), above.

46.    Plaintiff denies any liability to Lara in the Lara Action but, if found liable, in whole or in part, for the damages which Lara allegedly sustained, Plaintiff is entitled to partial equitable indemnity from the Defendants, and each of them, in proportion to their comparative fault.

**VII**

**SEVENTH CAUSE OF ACTION**
**[Declaratory Relief]**
**[Against All Defendants]**

47.    Plaintiff incorporates by reference as if fully set forth herein the allegations of paragraphs one (1) through forty- six (46), above.

48.    An actual controversy has arisen and now exists between the parties concerning their respective rights and duties because Plaintiff contends that Defendants are obligated to defend and indemnify Plaintiff in the above-entitled action, whereas Defendants, and each of them, dispute the rights

and liabilities of plaintiff with respect to this litigation, indemnification, facts of the case and the rights and liabilities of each party as against the other.

49. Plaintiff desires a judicial determination of its rights and duties, and a declaration as to whether Defendants, and each of them, are obligated to defend and indemnify Plaintiff in the above-entitled action.

50. A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiff may ascertain its rights and duties under the Agreement with respect to the obligation of Defendants, and each of them, to defend and indemnify Plaintiff in the above-entitled action.

51. Plaintiff has incurred and will continue to incur attorney's fees, expert fees, costs and discovery expenses in the above-entitled action. The exact amount of said attorney's fees, expert fees, costs and discovery expenses incurred, or to be incurred, has not yet been ascertained. Plaintiff will seek leave of Court, if necessary, to assert herein the true amount thereof in this Plaintiff when the amount has been ascertained. Defendants, and each of them, are obligated to Plaintiff for each and all of said attorney's fees, expert fees, costs and discovery expenses which have been incurred, or which will be incurred, by Plaintiff in the above-entitled action, and Defendants, and each of them should be ordered to pay to Plaintiff the true amount thereof upon the trial of the above-entitled action

## PRAYER

WHEREFORE, Plaintiff WM. BOLTHOUSE FARMS, INC., prays for judgment against Defendants, and each of them, as follows:

### ON THE FIRST CAUSE OF ACTION (As to Atkinson):

1. For consequential damages, including but not limited to attorney's fees, expert fees, costs, discovery expenses, potential settlement/judgment and other amounts incurred in defending the Lara Action in an amount according to proof; and

2. For reasonable attorney's fees and disbursements relating to this action pursuant to the Services Agreement, *Civil Code* §§ 1717 and 1717.5, and *Code of Civil Procedure* § 1021 in an amount according to proof.

\\\

\\\

**ON THE SECOND CAUSE OF ACTION** (As to Mesa)**:**

1.      For consequential damages, including but not limited to attorney's fees, expert fees, costs, discovery expenses, potential settlement/judgment and other amounts incurred in defending the Lara Action in an amount according to proof; and

2.      For reasonable attorney's fees and disbursements relating to this action in an amount according to proof.

**ON THE THIRD CAUSE OF ACTION** (As to Atkinson)**:**

1.      That in the event of a judgment being rendered against Plaintiff herein in favor of Lara or a settlement resulting in payment to Lara in the Lara Action, Plaintiff herein have judgment in an equal amount against Atkinson;

2.      That in the event of a judgment being rendered against Plaintiff herein in favor of Lara or a settlement resulting in payment to Lara in the Lara Action, that this Court declare that Plaintiff is entitled to be indemnified by Atkinson for the amount paid to Lara.

3.      That Plaintiff have judgment against Atkinson for Plaintiff's costs and expenses in defending itself against the claims of Lara.

**ON THE FOURTH CAUSE OF ACTION** (As to Mesa)**:**

1.      That in the event of a judgment being rendered against Plaintiff herein in favor of Lara or a settlement resulting in payment to Lara in the Lara Action, Plaintiff herein have judgment in an equal amount against Mesa;

2.      That in the event of a judgment being rendered against Plaintiff herein in favor of Lara or a settlement resulting in payment to Lara in the Lara Action, that this Court declare that Plaintiff is entitled to be indemnified by Mesa for the amount paid to Lara.

3.      That Plaintiff have judgment against Mesa for Plaintiff's costs and expenses in defending itself against the claims of Lara.

**ON THE FIFH CAUSE OF ACTION** (As to all Defendants)**:**

1.      That in the event of a judgment being rendered against Plaintiff herein in favor of Lara or a settlement resulting in payment to Lara in the Lara Action, Plaintiff herein have judgment in an equal amount over and against Defendants, and each of them;

2.     That in the event of a judgment being rendered against Plaintiff herein in favor of Lara or a settlement resulting in payment to Lara in the Lara Action, that this Court declare that Plaintiff is entitled to be indemnified from Defendants, and each of them, for the amount of any judgment awarded to Lara;

3.     That Plaintiff have judgment against Defendants, and each of them, for Plaintiff's costs and expenses in defending itself against the claims of Lara;

4.     That Plaintiff have judgment against Defendants, and each of them, for attorneys' fees incurred by Plaintiff in defending itself against the claims of Lara, pursuant to *Code of Civil Procedure* Section 1021.6.

**ON THE SIXTH CAUSE OF ACTION** (As to all Defendants)**:**

1.     That in the event of a judgment being rendered against Plaintiff herein in favor of Lara or a settlement resulting in payment to Lara in the Lara Action, Plaintiff herein have judgment in an equal amount over and against Defendants, and each of them;

2.     That in the event of a judgment being rendered against Plaintiff herein in favor of Lara or a settlement resulting in payment to Lara in the Lara Action, that this Court declare that Plaintiff is entitled to be indemnified from Defendants, and each of them, for the amount of any judgment awarded to Lara.

3.     That Plaintiff have judgment against Defendants, and each of them, for Plaintiff's costs and expenses in defending itself against the claims of Lara;

4.     That Plaintiff have judgment against Defendants, and each of them, for attorneys' fees incurred by Plaintiff in defending itself against the claims of Lara, pursuant to *Code of Civil Procedure* Section 1021.6.

**ON THE SEVENTH CAUSE OF ACTION** (As to all Defendants)**:**

1.     For a declaration that Defendants, and each of them, are obligated to defend, indemnify and hold harmless Plaintiff in the above-entitled action;

**ON ALL CAUSES OF ACTION** (As to all Defendants)**:**

1.     For costs of suit in an amount according to proof; and,

2.     For such other and further relief as this Court may deem equitable, just and proper.

\\\

\\\

DATED: October ___, 2019          By _____
                                     DENNIS P. GALLAGHER, II, ESQ.
                                     Attorneys for Plaintiff,
                                     WM. BOLTHOUSE FARMS, INC.

EXHIBIT A

# MESA UNDERWRITERS SPECIALTY
# INSURANCE COMPANY



2/17/2015  AF

MESA UNDERWRITERS SPECIALTY INSURANCE COMPANY
P.O. BOX 4030
SCOTTSDALE, ARIZONA 85261-4030

COMMERCIAL INSURANCE POLICY

MUSIC and its General Agent Hull and Company, Inc.

are pleased to have issued  Policy MP0036002002040 to

ATKINSON STAFFING, INC

In witness whereof, Mesa Underwriters Speciality Insurance Company has caused this policy to be signed by its President and countersigned on the Declaration page by a duly Authorized Representative of the Company.

Corporate Secretary

President

MUSIC

**MUS 01 01 10001 0412**                    INSURED

# COMMON POLICY DECLARATIONS

**MESA UNDERWRITERS SPECIALTY INSURANCE COMPANY**

**Policy Number:** MP0036002002040

- ☐ **New**
- ☒ **Renewal**
- ☐ **Cross-Ref**
- ☐ **Rewrite**

**Previous Policy Number:** MP0036002001475

**Policy Period:** From 01/27/2015 To 01/27/2016 at **12:01 A.M.** Standard Time at your mailing address shown below.

Minimum Earned Premium 25%
No Flat Cancellation

**Named Insured:**
ATKINSON STAFFING, INC

**Tax State:** OR

**Mailing Address:**
PO BOX 1168

HERMISTON          OR 97838

This is evidence of insurance procured and developed under the Oregon surplus line laws. It is NOT covered by the provisions of ORS 734.510 to 734.710 relating to the Oregon Insurance Guaranty Association. If the insurer issuing this insurance becomes insolvent, the Oregon Insurance Guaranty Association has no obligation to pay claims under this evidence of insurance.

**Agent and Mailing Address:**     **Agent Number:** 36002
Hull and Company, Inc.

6443 SW Beaverton-Hillsdale Hwy., Suite 350
Portland          OR 97221

*Jenny Supescu*

**Business Description:**

---

**Select Coverage Part (for which insurance is being afforded)**

| Coverage | | Amount |
|---|---|---|
| ☐ **Commercial General Liability** | $ | |
| ☐ **Commercial Property** | $ | |
| ☐ **Commercial Inland Marine** | $ | |
| ☐ **Commercial Crime** | $ | |
| ☒ **Garage** | $ | 15,864.00 |
| ☐ **TRIA** | $ | |
| ☒ **Other** (Describe) ADDITIONAL INSURED | $ | 200.00 |

ENTERED 2/17/2015 AF

```
BROKER FEE          $500.00
SURPLUS TAX         $331.28
SLSC                $15.00
FIRE MARSHALL       $49.69
```

| | | |
|---|---|---|
| **Total Advance Premium** | $ | 16,064.00 |
| **Total Other Charges** | $ | 895.97 |
| **Total** | $ | 16,959.97 |

---

**Premiums Shown are payable at inception or as indicated on the individual Coverage Declarations.**

Form(s) and Endorsement(s), including edition dates, made a part of this policy at the time of issue: See Schedule of Forms

Countersigned: Portland          OR     02/16/2015     By: _____

Date          *Jenny Supescu*          Authorized Agent

**MUS 01 01 10002 0412**          INSURED

# SCHEDULE OF FORMS AND ENDORSEMENTS

**MESA UNDERWRITERS SPECIALTY INSURANCE COMPANY**

| | |
|---|---|
| Named Insured | ATKINSON STAFFING, INC |
| Policy Number | MP0036002002040 |
| Effective Date: | 01/27/2015 |

**Forms Applicable - COMMON POLICY FORMS**

MUS 01 01 10001 0412  POLICY JACKET
MUS 01 01 10002 0412  COMMON POLICY DECLARATION
MUS 01 01 10003 1013  SCHEDULE OF FORMS & ENDORSEMENTS
MUS 01 01 10007 1013  MINIMUM EARNED PREMIUM ENDORSEMENT
MUS 01 01 10043 1013  PRIVACY NOTICE
IL 00 17 11 98        COMMON POLICY CONDITIONS
MUS 01 01 10035 1013  OR SERVICE OF SUIT
ILN 085 02 11         OR FRAUD STATEMENT

**Forms Applicable - GENERAL LIABILITY**

MUS 01 01 20001 0412  GENERAL LIABILITY COVERAGE PART DECLARATIONS
MUS 01 01 20002 0412  GENERAL LIABILITY SUPPLEMENTAL DECLARATIONS
MUS 01 01 20004 1013  LIABILITY DEDUCTIBLE
MUS 01 01 20007 1013  LIMITED COVG FOR CONTRACTORS & EMPLOYEES - GENERAL LIABILITY
MUS 01 01 20015 1013  EXCL - MAD COW DISEASE/CHRONIC WASTING DISEASE
MUS 01 01 20016 1013  EXCL - LETHAL WEAPONS
MUS 01 01 20055 1013  EXCL - ASSAULT OR BATTERY
MUS 01 01 20058 1013  EXCL - LEAD CONTAMINATION
MUS 01 01 20063 1013  EXCL - PUNITIVE DAMAGES
MUS 01 01 20080 1013  EXCL - EARTH MOVEMENT
MUS 01 01 20082 1013  EXCL - ASBESTOS
MUS 01 01 20084 1013  NON-STACKING OF LIMITS ENDORSEMENT
MUS 01 01 20094 1013  AMENDMENT OF CONDITIONS - PREMIUM AUDIT
MUS 01 01 20112 1013  EXCL - OCCUPATIONAL DISEASE
CG 00 01 04 13        COMMERCIAL GENERAL LIABILITY COVG FORM
CG 20 10 04 13        AI - OWNERS, LESSEES OR CONTRACTORS - SCHEDULED PERSON OR ORGANIZATION
CG 20 10 04 13        AI - OWNERS, LESSEES OR CONTRACTORS - SCHEDULED PERSON OR ORGANIZATION
CG 20 10 04 13        AI - OWNERS, LESSEES OR CONTRACTORS - SCHEDULED PERSON OR ORGANIZATION
CG 20 10 04 13        AI - OWNERS, LESSEES OR CONTRACTORS - SCHEDULED PERSON OR ORGANIZATION
CG 21 47 12 07        EMPLOYMENT-RELATED PRACTICES EXCLUSION
CG 21 55 09 99        EXCL - TOTAL POLLUTION EXCLUSION WITH A HOSTILE FIRE EXCEPTION
CG 21 67 12 04        EXCL - FUNGI OR BACTERIA
CG 21 96 03 05        EXCL - SILICA OR SILICA-RELATED DUST
CG 24 26 04 13        AMENDMENT OF INSURED CONTRACT DEFINITION
IL 00 21 09 08        NUCLEAR ENERGY LIABILITY EXCL ENDT
IL 01 42 09 08        OR CHANGES - DOMESTIC PARTNERSHIP
CG 21 73 01 15        EXCL OF CERTIFIED ACTS OF TERRORISM

MESA UNDERWRITERS SPECIALTY
INSURANCE COMPANY

Policy Number: **MP0036002002040**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# MINIMUM EARNED PREMIUM ENDORSEMENT

This endorsement modifies insurance provided under the following:

THIS ENDORSEMENT APPLIES TO ALL COVERAGE PARTS

If this insurance is cancelled at your request, there will be a minimum earned premium retained by Mesa Underwriters Specialty Insurance Company of $             or   25   % of the premium for this insurance, whichever is greater.

Cancellation of this insurance for nonpayment of premium is considered a request by the first Named Insured for cancellation of this insurance.

The provisions of this amendment apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the minimum earned premium.

All other terms and conditions of this policy remain unchanged.

MESA UNDERWRITERS SPECIALTY
INSURANCE COMPANY

**PRIVACY POLICY**
**For**
**MESA UNDERWRITERS SPECIALTY INSURANCE COMPANY**

Mesa Underwriters Specialty Insurance Company understands the importance placed by our customers on the privacy and safeguarding of their personal information. The Company intends and is obligated to protect all nonpublic personal information provided to the Company by our customers. Whether a consumer is already a policyholder or is applying for insurance or is a claimant, the Company will maintain the confidentiality and security of all individual's personal information as required by law.

In order to meet our customers' insurance needs and to comply with business, regulatory and legal obligations we are required to collect and at times, use personal information. The Company does not disclose personal information about customers, potential or former, for marketing purposes to nonaffiliated third parties. The Company may gather information from a variety of sources including but not limited to the Company's affiliates, consumer reporting agencies such as credit bureaus, property inspection services and other non-affiliated third party organizations. We do not disclose any personal information about our customers, except as follows:

1)  with consumer/customer consent,
2)  as required by law,
3)  as permitted by law
4)  as necessary or appropriate to underwrite, administer, service, effect, process or enforce an insurance policy that we have issued ( or are considering issuing), or
5)  as necessary to otherwise service a customer's policy or effect a customer

When necessary, the Company may disclose nonpublic personal information to a nonaffiliated organization that is performing services relative to the policy or our operation, we require that such third parties use and disclose the information only as necessary relating to the service or function that they are performing on our behalf. It is important that the Companies' employees be aware of and abides by this Privacy Policy and the applicable laws governing the use, handling and disclosure of nonpublic personal information. Our employees may not access nonpublic personal information maintained by the Company on a general basis. Company employees will have access to personal nonpublic information of applicants, policyholders or claimants if this information relates to their job performance for the Company. The Company will maintain adequate safeguards to protect the confidentially and security of the nonpublic personal information that we obtain. Employees may not disclose or use nonpublic personal information except as authorized by the Company or as permitted or required by law. If an employee fails to comply with these requirements this may lead to appropriate disciplinary action by the Company up to, and including, dismissal.

This Privacy Policy applies to individuals who are applicants, policyholders, or claimants under insurance products or services obtained from the Company primarily for personal, family or household purposes; it does not apply to products or services obtained for business, commercial or agricultural purposes.

The Company will provide notice of its privacy policy to its customers not less than annually, while the policyholder maintains a relationship with us.

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

INSURED

# MESA UNDERWRITERS SPECIALTY INSURANCE COMPANY

Policy Number: **MP0036002002040**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SERVICE OF SUIT OREGON

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS

For any cause of action arising in Oregon under this policy, we may be sued in the courts for the county where the agent who registered or delivered the policy lives or transacts business.  Such agent, served with a summons and complaint, will mail immediately the documents of process, or a copy thereof, with proper postage affixed, by registered or certified mail to corporation Service Company, 285 Liberty Street NE, Salem, OR, 97301.  We will have 40 days from the date of service of the summons and complaint on the agent in which to plead, answer or otherwise defend the cause of action.

Premiums charged on this policy are subject to the following taxes and fees:

| | | | |
|---|---|---|---|
| State Tax: | 49.69 | Surplus Lines Service Charge: | 331.28 |
| Fire Marshal Fee: | 15.00 | Total: | 395.97 |

This contract is registered and delivered as a surplus line coverage under the insurance code of the state of Oregon, issued by an unauthorized insurer, under agent's license number

_Jenny Juplscu_
Authorized Representative

# OREGON FRAUD STATEMENT

Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents materially false information in an application for insurance may be guilty of a crime and may be subject to fines and confinement in prison.

In order for us to deny a claim on the basis of misstatements, misrepresentations, omissions or concealments on your part, we must show that:

**A.** The misinformation is material to the content of the policy;

**B.** We relied upon the misinformation; and

**C.** The information was either:

    **1.** Material to the risk assumed by us; or

    **2.** Provided fraudulently.

For remedies other than the denial of a claim, misstatements, misrepresentations, omissions or concealments on your part must either be fraudulent or material to our interests.

With regard to fire insurance, in order to trigger the right to remedy, material misrepresentations must be willful or intentional.

Misstatements, misrepresentations, omissions or concealments on your part are not fraudulent unless they are made with the intent to knowingly defraud.

INSURED

# COMMERCIAL GENERAL LIABILITY Coverage Part Declarations

This Coverage Part consists of this Declarations Form, the Common Policy Conditions, the Commercial General Liability Conditions, the Coverage Form(s), and the Coverage Endorsement(s) indicated as applicable.

| | |
|---|---|
| Named Insured | ATKINSON STAFFING, INC |
| Policy Number | MP0036002002040 |
| Effective Date: | 01/27/2015 |

## LIMITS OF INSURANCE                              □ "X" If Supplemental Declarations is attached.

| | |
|---|---|
| General Aggregate Limit (Other Than Products / Completed Operations) | $ 2,000,000 |
| Products / Completed Operations Aggregate Limit | $ 2,000,000 |
| Personal and Advertising Injury Limit | $ 1,000,000 |
| Each Occurrence Limit | $ 1,000,000 |
| Damage to Premises Rented to You Limit    (Any 1 Premises) | $ 100,000 |
| Medical Expense Limit   (Any 1 Person) | $ 5,000 |

## BUSINESS DESCRIPTION AND LOCATION OF PREMISES

**Form of Business:**

☐ Individual  ☐ Joint Venture  ☐ Partnership  ☐ Limited Liability Company  ☒ Organization (other): _____

**Business Description:** _____

**Location(s) of All Premises you Own, Rent or Occupy:**

1) 80796 HIGHWAY 395 NORTH, HERMISTON, OR 97838
2)
3)

## CLASSIFICATION & PREMIUM PROVIDED

| Code No. | Classification Description | Premium Basis / Exposure* | Rate Premises / Operations | Rate Products / Comp Ops | Advanced Premium Premises / Operations | Advanced Premium Products / Comp Ops |
|---|---|---|---|---|---|---|
| 43840 | Fruit/Vegetable - Harvest Contractor | s 5,000,000 | 1.8500 | .0400 | 824 | |
| 16604 | Vegetable and Fruit Packing | s 6,000,000 | 1.6100 | .3000 | 5,615 | 6,905 |
| 57002 | Milk Processing | s 2,600,000 | 1.4100 | .5100 | 276 | 2,244 |

*Premium Basis Types:   **p - Payroll** (per $1,000 of Payroll)    **c - Cost** (per $1,000 Total Cost)    **s - Sales** (per $1,000 Gross Sales)
**a - Area** (per 1,000 Square feet of area)   **m - Admissions** (per 1,000 Admissions)   **u - Units** (per Unit)
**t – Total** (per each)

**Total Annual Premium:** $ 16,064

| Forms/Endorsements Applicable | See Schedule of Forms and Endorsements |
|---|---|

# Premium Basis Definitions:

1) **"Payroll"** means:
Remuneration which includes money or substitutes for money.
**Payroll Includes:**

   a.  Commissions, bonuses, pay for holidays, vacations or periods of illness;

   b.  Extra pay for overtime in accordance with the manuals in use by us;

   c.  Payments by an employer or amounts otherwise required by law to be paid by employees to statutory insurance or pension plans, such as the Federal Social Security Act;

   d.  Payment to employees on any basis other than time worked, such as piece work, profit sharing or incentive plans;

   e.  Payment or allowance for hand tools or power tools used by hand provided by employees and used in their work or operations for the insured;

   f.  The rental value of an apartment or house provided for an employee based on comparable accommodations;

   g.  Value of meals and lodging other than an apartment or house received by employees as part of their pay;

   h.  The value of store certificates, merchandise, credits or any other substitute for money received by employees as part their pay;

   i.  The payroll of mobile equipment operators and their helpers, whether or not the operators are designated or licensed to operate automobiles. If the operators and their helpers are provided to the insured along with equipment hired under contract and their actual payroll is not known, use 1/3 of the total amount paid out by the insured for the hire or the equipment;

   j.  The payroll of executive officers and individual insureds and co-partners in accordance with the manuals in use by us;

   k.  Fees paid to employment agencies for temporary personnel provided to the insured.

**Payroll does not include:**

   a.  Tips and other gratuities received by employees;

   b.  Payments by an employer to group insurance or group pension plans for employees I in accordance with manuals in use by us;

   c.  The value of special rewards for individual invention or discovery;

   d.  Dismissal or severance payments except for time worked or accrued vacation;

   e.  The payroll of clerical office employees;

   f.  The payroll of salesmen, collectors or messengers who work principally away from the insured's premises. Salesmen, collectors or messengers are those employees engaged principally in any such duties away from the premises of the employer; Exception:  This term does not apply to any employee whose duties include the delivery of any merchandise handled, treated or sold.

   g.  The payroll of aircraft pilots or co-pilots if their principal duties are to work on or in connection with aircraft in either capacity.

**The rates apply per $1,000 payroll.**

2) **"Cost"** means:
The total cost of all work let or sublet in connection with each specific project including:

   a.  The cost of all labor, materials and equipment furnished, used or delivered for use in the execution of the work; and

   b.  All fees, bonuses or commissions made, paid or due.

**The rates apply per $1,000 of cost.**

3) **"Sales"** means:
The gross amount charged by the named insured, concessionaires of the named insured or by others trading under the insured's name for:

   1.  All goods or products, sold or distributed;

   2.  Operations performed during the policy period;

   3.  Rentals.

   A.  **Gross Sales includes:**

      1.  Foreign exchange discounts;

      2.  Freight allowance to customers;

      3.  Total sales of consigned goods and warehouse receipts;

      4.  Trade or cash discounts;

      5.  Bad debts; and

      6.  Repossession of items sold on installments (amount actually collected).

   B.  **Gross Sales excludes:**

      1.  Sales or excise taxes which are collected and submitted to a governmental division;

      2.  Credits for repossessed merchandise and products returned. Allowances for damaged and spoiled goods;

      3.  Finance charges for items sold on installments;

      4.  Freight charges on sales if freight is charged as a separate item on customers invoice; and

      5.  Royalty income from patent rights or copyrights which are not products sales.

**The rates apply per $1,000 of gross sales.**

4) **"Area"** means:
The total number of square feet of floor space at the insured premises, computed as follows:

   A.  For entire buildings, by multiplying the product of the horizontal dimensions of the outside of the outer building walls by the number of floors, including basements but do not use the area of the following:

      1.  Courts and mezzanine types of floor openings.

      2.  Portions of basements of floors where 50% or more of the area used for shop or storage for building maintenance, dwelling by building maintenance employees, heating units, power plants or air-conditioning equipment.

   B.  For tenants, determine the area they occupy in the same manner as for the entire building.

**The rates apply per 1,000 square feet of area.**

5) **"Admissions"** means:
The total number of persons, other than employees of the named insured, admitted to the event insured or to events conducted on the premises whether on paid admissions, tickets, complimentary tickets or passes.

**The rates apply per 1,000 admissions.**

6) **"Units"** means:
A single room or group of rooms intended for occupancy as separate living quarters by a family, by a group of unrelated persons living together, or by a person living alone.

**The rates apply per each unit.**

7) **"Total"** means:
This basis of premium involves units of exposure, and the quantity comprising each unit of exposure is indicated in the declarations page, such as "per person."

**The rates apply per unit.**

MESA UNDERWRITERS SPECIALTY
INSURANCE COMPANY

# COMMERCIAL GENERAL LIABILITY Coverage Part Supplemental Declarations

Named Insured: ATKINSON STAFFING, INC

Policy Number: MP0036002002040

Effective Date: 01/27/2015

## ADDITIONAL LOCATION OF PREMISES

Location(s) of All Premises you Own, Rent or Occupy:

)_____
)_____
)_____
)_____
)_____
)_____
)_____
)_____
)_____
)_____
)_____
)_____

## ADDITIONAL CLASSIFICATIONS & PREMIUMS PROVIDED

| Code No. | Classification Description | Premium Basis / Exposure* | Rate Premises / Operations | Rate Products / Comp Ops | Advanced Premium Premises / Operations | Advanced Premium Products / Comp Ops |
|---|---|---|---|---|---|---|
| 11111 | Additional Insured | u        4 | 50.0000 | | 200 | |

*Premium Basis Types:  **p - Payroll** (per $1,000 of Payroll)   **c - Cost** (per $1,000 Total Cost)   **s - Sales** (per $1,000 Gross Sales)
**a - Area** (per 1,000 Square feet of area)   **m - Admissions** (per 1,000 Admissions)   **u - Units** (per Unit)
**t – Total** (per each)

| Extension of General Liability Declaration - Total Annual Premium: | $ | 16,064 |
|---|---|---|

| Forms/Endorsements Applicable | See Schedule of Forms and Endorsements |
|---|---|

MESA UNDERWRITERS SPECIALTY
INSURANCE COMPANY

Policy Number:  MP0036002002040

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# LIABILITY DEDUCTIBLE
## (Including Costs and Expenses)

| Coverage | Amount of Deductible | |
|---|---|---|
| Bodily Injury Liability | 500 | per "claim" |
| Property Damage Liability | 500 | per "claim" |
| Personal and Advertising Injury | NIL | per "claim" |

A.   The Company's obligations under the coverage afforded by this policy to pay damages on behalf of the Insured apply only to the amount of damages in excess of the deductible amount stated above.

B.   The deductible amount applies to all damages sustained by one person or organization as the result of any one claim.

C.   The deductible amount stated will also apply towards investigation, adjustment and legal expenses incurred in the handling and investigation of each claim, whether or not payment is made to claimant, compromise settlement is reached or claim is denied.

D.   The terms of the policy, including those with respect to the Company's rights and duties with respect to the defense of suits and the Insured's duties in the event of an occurrence apply irrespective of the application of the deductible amount.

E.   The Company, at its sole election and option, may either:

1.   Pay any part of or all of the deductible amount to effect settlement of any claim or suit, and upon notification of the action taken, the Named Insured shall promptly reimburse the Company for such part of the deductible amount as has been paid by the Company; or

2.   Simultaneously upon receipt of notice of any claim or at any time thereafter, call upon the Insured and request said Insured to pay over and deposit with the Company all or part of the deductible amount, to be held and applied by the Company as herein provided.

All other terms and conditions of this policy remain unchanged.

**MESA UNDERWRITERS SPECIALTY
INSURANCE COMPANY**

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# LIMITED COVERAGE FOR CONTRACTORS AND EMPLOYEES
## (General Liability)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

A. SECTION 1 – COVERAGE A BODILY INJURY AND PROPERTY DAMAGE, 2. Exclusions, is deleted and replaced as follows:

This Insurance does not apply to:

e. Employer's Liability

"Bodily Injury" to:

(1) An "employee", "temporary worker", "leased employee", or independent contractor of the insured or any additional insured or employee of any independent contractor arising out of and in the course of:

(a) Employment by the insured or any additional insured or independent operator

(b) Performing duties related to the conduct of the insured or any additional insured's business; or

(c) Arising out of the injured party's employment; or

(2) A fellow "employee", "temporary worker", "leased employee", or independent contractor of the insured or any additional insured arising out of the course of such  employment when the insured is an "executive officer" of such employer; or

(3) The spouse, children, parent, brother or sister of that fellow "employee", "temporary worker", "leased employee", or independent contractor as a consequence of Paragraph (1) above.

This exclusion applies:

(1) Whether an insured may be liable as an employer or in any other capacity;

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury; or

(3) To any liability assumed under any contract or agreement.

B. SECTION V – DEFINITIONS, subparagraph 19. is deleted and replaced with the following:

19. "Temporary Worker" means any person who is:

(a) Furnished to you to substitute for a permanent "employee";
(b) A short-term worker; or
(c) Not an "employee" or "volunteer" worker

All other terms and conditions of this policy remain unchanged.

MESA UNDERWRITERS SPECIALTY
INSURANCE COMPANY

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION - MAD COW DISEASE/CHRONIC WASTING DISEASE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
FARM LIABILITY COVERAGE FORM

This insurance does not apply to any claim for "bodily injury", "property damage", "personal injury" or "advertising injury" caused by, based on, or arising from any prion disease, including but not limited to, Mad Cow Disease, Bovine Spongiform Encephalopathy, Chronic Wasting Disease, Creutzfeldt-Jakob Disease (CJD) or a variant form of Creutzfeldt-Jakob Disease, Scrapie, Gerstmann-Straussler-Scheinker (GSS), any Transmissible Spongiform Encephalopathy (TSE's), or any other similar or related brain wasting diseases, whether or not the claim relates to a human form of the disease or an animal form of the disease.

This exclusion applies regardless of whether the cause is alleged to be the negligence of the insured for failure to properly clean, sanitize or sterilize an area, equipment, instruments or from any other cause.

All other terms and conditions of this policy remain unchanged.

**MESA UNDERWRITERS SPECIALTY
INSURANCE COMPANY**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION - LETHAL WEAPONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

SECTION I – COVERAGE A BODILIY INJURY AND PROPERTY DAMAGE LIABILITY, 2. EXCLUSIONS and
COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY, 2. EXCLUSIONS are amended and the
following added:

USE OF WEAPONS

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising
out of or resulting from the possession, ownership, maintenance, use of or threatened use of a lethal weapon,
including but not limited to firearms by any person

All other terms and conditions of this policy remain unchanged.

**MESA UNDERWRITERS SPECIALTY INSURANCE COMPANY**

Policy Number: MP0036002002040

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ASSAULT OR BATTERY EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

### Assault or Battery Exclusion – Excluded Location Schedule

***If no locations are specified below, the Assault or Battery Exclusion applies to ALL locations***

| Loc. # | Address |
|--------|---------|
|        |         |
|        |         |
|        |         |

**I.** This insurance does not apply to locations specified in the above Schedule for "bodily injury", "property damage", "personal and advertising injury", or medical payments under Coverage C, caused by, arising out of, resulting from, or in any way related to an "assault" or "battery" when that "assault" or "battery" is caused by, arising out of, or results from, in whole or in part from:

**A.** The direct or indirect instigation, instruction or direction, by you, your employees, patrons or any other persons, or

**B.** The failure to provide a safe environment including but not limited to the failure to provide adequate security, or to warn of the dangers of the environment, or

**C.** The negligent employment, investigation, supervision, hiring, training or retention of any person, or

**D.** Negligent, reckless, or wanton conduct by you, your employees, patrons or any other persons, or

**E.** The use of force, whether excessive or not, to protect persons or property whether or not the "bodily injury", "property damage", or "personal and advertising injury" was intended from the standpoint of the insured or committed by or at the direction of any insured; or

**F.** The failure to render or secure medical treatment or care necessitated by any "assault" or "battery".

This exclusion applies to all locations if the above Excluded Location Schedule is left blank. Further, this exclusion also applies to all locations specified in the Limited Assault or Battery Coverage endorsement if also attached to the policy.

**II.** For the purpose of this endorsement only, Exclusion **a. Expected Or Intended Injury,** part of **SECTION I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY,** is deleted and replaced by:

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured.

**III.** For the purpose of this endorsement only, the following definitions are added to **SECTION V – DEFINITIONS**

    A. "Assault" means any intentional act, or attempted act or threat to inflict injury to another including any conduct that would reasonably place another in apprehension of injury, including but not limited to physical injury, sexual abuse or harassment, intimidation, verbal abuse, and any threatened harmful or offensive contact between two or more persons.

    B. "Battery" means the intentional or reckless use of force including a physical altercation or dispute between persons, or offensive touching or sexual molestation against another, resulting in injury whether or not the actual injury inflicted is intended or expected. The use of force includes, but is not limited to the use of a weapon.

All other terms and conditions of this policy remain unchanged.

**MESA UNDERWRITERS SPECIALTY
INSURANCE COMPANY**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# LEAD CONTAMINATION EXCLUSION

This endorsement modifies insurance provided under the following:

> COMMERCIAL GENERAL LIABILITY COVERAGE FORM
> COMMERCIAL PROFESSIONAL LIABILITY COVERAGE FORM
> GARAGE COVERAGE PART

In consideration of the premium charged it is hereby understood and agreed that this policy will not provide coverage, meaning indemnification or defense costs, arising out of:

"Bodily injury", "property damage", "personal injury", "advertising injury", "medical payments", or any other damages because of liability, alleged liability, or occurrence resulting from, caused by, arising out of, or in any way connected with:

The existence of lead, the removal of lead, the testing for lead, or exposure to lead in any form which is or has at any time been present in, on, or near:

1. the insured's premises; or
2. at any location at which the insured is working or has worked in connection with such existence, removal, or testing

Whether or not:

1. caused by, at the instigation of, or with the direct or indirect involvement of the insured, the insured's employees or other persons on the insured's premises or work site; or,
2. whether or not caused by or arising out of the insured's failure to properly supervise or keep the work site in a safe condition.

All other terms and conditions of this policy remain unchanged.

MESA UNDERWRITERS SPECIALTY
INSURANCE COMPANY

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# PUNITIVE DAMAGES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
COMMERCIAL PROFESSIONAL LIABILITY COVERAGE FORM
GARAGE COVERAGE PART

This insurance does not apply to any fines, penalties, punitive damages, exemplary damages, treble damages or the multiplication of compensatory damages.

All other terms and conditions of this policy remain unchanged.

MESA UNDERWRITERS SPECIALTY
INSURANCE COMPANY

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EARTH MOVEMENT EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
COMMERCIAL PROFESSIONAL LIABILITY COVERAGE FORM
GARAGE COVERAGE PART

In consideration of the premium charged, it is understood and agreed that this policy specifically excludes and does not extend to, or provide coverage or indemnity for, any claim of liability for bodily injury or property damage caused by, resulting from, attributable or contributed to or aggravated by the subsidence of land as a result of landslide, mudflow, earth sinking or shifting, resulting from any operations of the Named Insured or on behalf of any Named Insured or any subcontractor of the Named Insured.

All other terms and conditions of this policy remain unchanged.

**MESA UNDERWRITERS SPECIALTY
INSURANCE COMPANY**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION - ASBESTOS

This endorsement modifies insurance provided under the following:

    COMMERCIAL GENERAL LIABILITY COVERAGE FORM
    COMMERCIAL PROFESSIONAL LIABILITY COVERAGE FORM
    GARAGE COVERAGE PART

In consideration of the premium charged, it is understood and agreed that this policy will not provide coverage, meaning indemnification or defense costs arising out of:

1. Asbestos or any asbestos related "bodily injury", or "property damage" or
2. Any alleged act, error, omission, or duty involving asbestos, its use, exposure, presence, existence, detection, removal, elimination, transportation, disposal or avoidance or
3. The use, exposure, presence, existence, detection, removal, elimination, or avoidance of asbestos in any environment, building or structure.

      All other terms and conditions of this policy remain unchanged.

**MUS 01 01 20082 1013**               INSURED                    **Page 1 of 1**

MESA UNDERWRITERS SPECIALTY
INSURANCE COMPANY

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# NON-STACKING OF LIMITS ENDORSEMENT
## TWO OR MORE COVERAGE FORMS, COVERAGE
## PARTS, OR POLICIES ISSUED BY US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
COMMERCIAL PROFESSIONAL LIABILITY COVERAGE FORM
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
FARM LIABILITY COVERAGE FORM
GARAGE COVERAGE PART

If any coverage form or coverage part or policy issued to you by us or any company affiliated with us apply to the same claim for damages, the maximum limit of insurance for liability coverage under all of the coverage forms, coverage parts, or policies shall not exceed the highest applicable limit of insurance available under any one coverage form, coverage part or policy.

This endorsement does not apply to any coverage form, coverage part or policy issued by us or an affiliated company specifically to apply as excess insurance over this policy.

All other terms and conditions of this policy remain unchanged.

**MESA UNDERWRITERS SPECIALTY INSURANCE COMPANY**

Policy Number: **MP0036002002040**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AMENDMENT OF CONDITIONS – PREMIUM AUDIT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

The Premium Audit Condition under **Section IV – Conditions** is **replaced** by the following:

**Premium Audit**

a.  We will compute all premiums for this Coverage Part in accordance with our rules and rates. Premium shown in this Coverage Part as advance premium is a minimum and deposit premium.

The rates for each classification shown in the Declarations are multiplied by the estimated premium bases of that classification for the term to determine the advance premium.

We may conduct an audit of your books to determine the actual premium bases developed during the policy period. To calculate the actual premium developed during the policy period we will use one, or a combination, of the follow premium bases: payroll, admissions, gross sales, total cost, area, each exposure unit, units or total operating expenditures.

b.  **Premium Bases.**
    The premium bases are defined in accordance with our rules and the following definitions:

    **(1) Payroll** (premium basis symbol **p**): Remuneration paid to "employees", including but not limited to:

    (a) Money or substitutes for money; commissions; bonuses; overtime; payments to statutory insurance or pension plans; profit sharing or incentive plans; pay for holidays, vacation or sickness; and fees paid to employment agencies for temporary personnel provided to you.

    (b) If your operations consist of a number of separate operations classified individually in the Declarations, the payroll will be allocated to each classification where you have maintained records for each separate operation. Any such operation for which separate records are **not** maintained by you will be assigned to the highest rated classification.

    (c) For premium computation purposes, the payroll of executive officers, individual insureds and co-partners is subject to a minimum annual payroll per person of:

    $

    (If no entry is made, the minimum payroll as established by our rating rules will apply.)

The rates apply per $1,000 of Payroll.

**(2)** **Admissions** (premium basis symbol **m**): The total number of persons, other than your "employees", admitted to the insured event or to events conducted on the premises whether on paid admissions, tickets, complimentary tickets or passes.

The rates apply per 1,000 Admissions.

**(3)** **Gross Sales** (premium basis symbol **s**): The gross amount charged by you, your concessionaries or by others trading under your name for:

    (a)  All goods or products, sold or distributed;

    (b)  Operations performed during the policy period; and

    (c)  Rentals; or

    (d)  Dues or fees.

The rates apply per $1,000 of Gross Sales.

**(4)** "**Total Cost**" (premium basis symbol **c**) means the total cost of all work let or sublet in connection with each specific project including:

    (a)  The cost of all labor, materials and equipment furnished, used or delivered for use in the execution of the work excluding the cost of finished equipment installed whether or not furnished by the contractor, or subcontractor, or by you; and

    (b)  All fees, bonuses or commissions made, paid or due.

The rates apply per $1,000 of Total Cost.

**(5)** **Area** (premium basis symbol **a**): The total number of square feet of floor space at the insured premises. The rates apply per 1,000 square feet of Area.

**(6)** **Each** (premium basis symbol **t**): The basis of premium involves units of exposure, and the quantity compromising each unit of exposure is indicated in the Declarations, such as "per person".

**(7)** **Units** (premium basis symbol **u**): A single room or group or group of rooms intended for occupancy as separate living quarters by a family, by a group of unrelated persons living together, or by a person living alone. The rates apply per Unit.

**(8)** **Total Operating Expenditures** (premium basis symbol **o**): Total expenditures (including grants, entitlements and shared revenue) without regard to source of revenue during the policy period including accounts payable.

The rates apply per $1,000 of Total Operating Expenditures.

c.   The first Named Insured must keep records of the information we need for premium computation and send us copies at such times as we may request. Failure to supply such records upon request will be deemed a breach of condition and subject this policy, and may subject any in force policy of yours, to cancellation for breach of conditions.

d.  We reserve the right to examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

e.  Premium shown in this Coverage Part as advance premium is a minimum and deposit premium. Advance premium includes any payments identified as premium paid prior to policy expiration. At the close of each audit period, we will compute the earned premium for that period. Audit premium is due and payable upon notice to the first Named Insured. Failure to pay the audit premium due will be deemed a breach of contract and subject this policy, and may subject any in force policy of yours, to cancellation for non-payment of premium.

    (1) If the actual earned premium generated as a result of an audit for the policy period is less than the advance premium, such advance premium is the minimum premium for the policy period indicated and is not subject to this adjustment.

    (2) If the actual earned premium generated as a result of an audit for policy period is greater than the advance premium, then a final premium adjustment endorsement will be issued. The additional premium amount shown on the final premium adjustment endorsement is due and payable to us upon notice to the first Named Insured.

f.  Non-cooperation with Audits

    If after three documented attempts, we are unable to complete an audit, your policy may be cancelled or non-renewed

All other terms and conditions of this policy remain unchanged.

MESA UNDERWRITERS SPECIALTY
INSURANCE COMPANY

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION – OCCUPATIONAL DISEASE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

I.   The following exclusion is added to **2. Exclusions COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY, COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY, and COVERAGE C MEDICAL PAYMENTS,**  part of **SECTION I – COVERAGES:**

This insurance does not apply to "bodily injury", "property damage", "personal and advertising injury" or medical payments arising out of "occupational diseases".

"Occupational diseases" means any injury, including death, sickness, disease or disability, defined as occupational disease under any workers compensation or disability benefits laws, statues or regulations of any jurisdiction in which the "occurrence" took place or the "occupational disease" arose.

All other terms and conditions of this policy remain unchanged.

**MUS 01 01 20112 1013**                        INSURED                                **Page 1 of 1**

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** –Definitions.

## SECTION I – COVERAGES

## COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

### 1. Insuring Agreement

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

© Insurance Services Office, Inc., 2012

INSURED

## 2. Exclusions

This insurance does not apply to:

### a. Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

### b. Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b) Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

### c. Liquor Liability

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

(a) The supervision, hiring, employment, training or monitoring of others by that insured; or

(b) Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph (1), (2) or (3) above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

### d. Workers' Compensation And Similar Laws

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

### e. Employer's Liability

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f. Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

  (a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

    (i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

    (ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

    (iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

  (b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

  (c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

    (i) Any insured; or

    (ii) Any person or organization for whom you may be legally responsible; or

  (d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

    (i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

    (ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

    (iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

  (e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

© Insurance Services Office, Inc., 2012

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

**(b)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** – Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** – Limits Of Insurance.

## COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY

### 1. Insuring Agreement

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

### 2. Exclusions

This insurance does not apply to:

#### a. Knowing Violation Of Rights Of Another

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

#### b. Material Published With Knowledge Of Falsity

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

#### c. Material Published Prior To Policy Period

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

#### d. Criminal Acts

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

#### e. Contractual Liability

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

#### f. Breach Of Contract

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

#### g. Quality Or Performance Of Goods – Failure To Conform To Statements

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

#### h. Wrong Description Of Prices

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of web sites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a.**, **b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

## COVERAGE C – MEDICAL PAYMENTS

### 1. Insuring Agreement

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(a)** The accident takes place in the "coverage territory" and during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

### 2. Exclusions

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers' Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage **A**.

## SUPPLEMENTARY PAYMENTS – COVERAGES A AND B

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II – WHO IS AN INSURED

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

    **a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

      **(1)** "Bodily injury" or "personal and advertising injury":

        **(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

        **(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

        **(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(1)(a)** or **(b)** above; or

        **(d)** Arising out of his or her providing or failing to provide professional health care services.

      **(2)** "Property damage" to property:

        **(a)** Owned, occupied or used by;

        **(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

      you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

    **b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

    **c.** Any person or organization having proper temporary custody of your property if you die, but only:

      **(1)** With respect to liability arising out of the maintenance or use of that property; and

      **(2)** Until your legal representative has been appointed.

    **d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

    **a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

    **b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

    **c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

    **a.** Insureds;

    **b.** Claims made or "suits" brought; or

    **c.** Persons or organizations making claims or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

    **a.** Medical expenses under Coverage **C;**

    **b.** Damages under Coverage **A,** except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

    **c.** Damages under Coverage **B.**

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4.** Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

**a.** Damages under Coverage **A;** and

**b.** Medical expenses under Coverage **C**

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

**7.** Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

### 1. Bankruptcy

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

### 2. Duties In The Event Of Occurrence, Offense, Claim Or Suit

**a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" or offense took place;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b.** If a claim is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

### 3. Legal Action Against Us

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

## 4. Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

### a. Primary Insurance

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

### b. Excess Insurance

(1) This insurance is excess over:

    (a) Any of the other insurance, whether primary, excess, contingent or on any other basis:

        (i) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

        (ii) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

        (iii) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

        (iv) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability.

    (b) Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

(2) When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

(3) When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

    (a) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

    (b) The total of all deductible and self-insured amounts under all that other insurance.

(4) We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

### c. Method Of Sharing

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

## 5. Premium Audit

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

## 6. Representations

By accepting this policy, you agree:

a. The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION V – DEFINITIONS

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

**7.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**8.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

**9.** "Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

**10.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**11.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**12.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in Paragraph **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in Paragraph **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

(1) Equipment designed primarily for:

    (a) Snow removal;

    (b) Road maintenance, but not construction or resurfacing; or

    (c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

    (a) When all of the work called for in your contract has been completed.

    (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

    (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

    Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

(3) Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

   a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

   b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

   a. Means:

      (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

         (a) You;

         (b) Others trading under your name; or

         (c) A person or organization whose business or assets you have acquired; and

      (2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

   b. Includes:

      (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

      (2) The providing of or failure to provide warnings or instructions.

   c. Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work":

   a. Means:

      (1) Work or operations performed by you or on your behalf; and

      (2) Materials, parts or equipment furnished in connection with such work or operations.

   b. Includes:

      (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

      (2) The providing of or failure to provide warnings or instructions.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s): | Location(s) Of Covered Operations |
|---|---|
| TYSON FOODS<br><br>13982 DODD RD<br>WALLULA, WA 99363 | ONGOING OPERATIONS |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

1. Your acts or omissions; or
2. The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and
2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to "bodily injury" or "property damage" occurring after:

1. All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or
2. That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

© Insurance Services Office, Inc., 2012
INSURED

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

   **1.** Required by the contract or agreement; or

   **2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

POLICY NUMBER: MP0036002002040

# THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s): | Location(s) Of Covered Operations |
|---|---|
| CONAGRA FOODS<br>PO BOX 1900<br>PASCO, WA 99302 | ONGOING OPERATIONS |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

1. Your acts or omissions; or
2. The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and
2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to "bodily injury" or "property damage" occurring after:

1. All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or
2. That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

 © Insurance Services Office, Inc., 2012

INSURED

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

  **1.** Required by the contract or agreement; or

  **2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s): | Location(s) Of Covered Operations |
|---|---|
| WILLIAM BOLTHOUSE FARMS INC & IT'S SUBSIDIARIES<br>ATTN: ACCOUNTS PAYABLE<br>7200 E BRUNDAGE LANE<br>BAKERSFIELD, CA 93307 | ONGOING OPERATIONS |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

**1.** Your acts or omissions; or

**2.** The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to "bodily injury" or "property damage" occurring after:

**1.** All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

**2.** That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

© Insurance Services Office, Inc., 2012

INSURED

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

   **1.** Required by the contract or agreement; or

   **2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s): | Location(s) Of Covered Operations |
|---|---|
| GRIMMWAY ENTERPRISES, INC.<br>ATTN: CYNDI BLANKENSHIP<br>PO BOX 81498<br>BAKERSFIELD, CA 93380-1498 | PER WRITTEN CONTRACT |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** **Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

1. Your acts or omissions; or

2. The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to "bodily injury" or "property damage" occurring after:

1. All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

2. That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

© Insurance Services Office, Inc., 2012

INSURED

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

   **1.** Required by the contract or agreement; or

   **2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

   **(a)** Refusal to employ that person;

   **(b)** Termination of that person's employment; or

   **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

**(1)** A person arising out of any:

   **(a)** Refusal to employ that person;

   **(b)** Termination of that person's employment; or

   **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

© ISO Properties, Inc., 2006

INSURED

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION
# WITH A HOSTILE FIRE EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion **f.** under Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

**f. Pollution**

**(1)** "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

This exclusion does not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire" unless that "hostile fire" occurred or originated:

**(a)** At any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste; or

**(b)** At any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

Copyright, Insurance Services Office, Inc., 1998

INSURED

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**C.** The following definition is added to the **Definitions** Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

INSURED

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SILICA OR SILICA-RELATED DUST EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

**a.** "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

**b.** "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**c.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

**a.** "Personal and advertising injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**b.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**C.** The following definitions are added to the **Definitions** Section:

**1.** "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

**2.** "Silica-related dust" means a mixture or combination of silica and other dust or particles.

 © ISO Properties, Inc., 2004

INSURED

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF INSURED CONTRACT DEFINITION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

The definition of "insured contract" in the **Definitions** section is replaced by the following:

"Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf. However, such part of a contract or agreement shall only be considered an "insured contract" to the extent your assumption of the tort liability is permitted by law. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

    **(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

    **(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

INSURED

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT

### (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

1. The insurance does not apply:

    A. Under any Liability Coverage, to "bodily injury" or "property damage":

    (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

    B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

    C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

    (1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

    (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

    (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this endorsement:

    "Hazardous properties" includes radioactive, toxic or explosive properties.

    "Nuclear material" means "source material", "special nuclear material" or "by-product material".

© ISO Properties, Inc., 2007

INSURED

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

**(a)** Any "nuclear reactor";

**(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# OREGON CHANGES – DOMESTIC PARTNERSHIP

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
ELECTRONIC DATA LIABILITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCT WITHDRAWAL COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The term "spouse" is replaced by the following:

Spouse or individual who is in a domestic partnership recognized under Oregon law.

**B.** Under the Commercial Auto Coverage Part, the term "family member" is replaced by the following:

"Family member" means a person related to the:

**1.** Individual Named Insured by blood, adoption, marriage or domestic partnership recognized under Oregon law, who is a resident of such Named Insured's household, including a ward or foster child; or

**2.** Individual named in the Schedule by blood, adoption, marriage or domestic partnership recognized under Oregon law, who is a resident of the individual's household, including a ward or foster child, if the Drive Other Car Coverage – Broadened Coverage For Named Individual Endorsement is attached.

**C.** With respect to coverage for the ownership, maintenance, or use of "covered autos" provided under the Commercial Liability Umbrella Coverage Part, the term "family member" is replaced by the following:

"Family member" means a person related to you by blood, adoption, marriage or domestic partnership recognized under Oregon law, who is a resident of your household, including a ward or foster child.

 © ISO Properties, Inc., 2007
INSURED

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism".

**B.** The following definitions are added:

**1.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

**2.** "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**b.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

© Insurance Services Office, Inc., 2014

INSURED

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s): | Location(s) Of Covered Operations |
|---|---|
| WILLIAM BOLTHOUSE FARMS INC & IT'S SUBSIDIARIES ATTN: ACCOUNTS PAYABLE 7200 E BRUNDAGE LANE BAKERSFIELD, CA 93307 | ONGOING OPERATIONS |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

**1.** Your acts or omissions; or

**2.** The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to "bodily injury" or "property damage" occurring after:

**1.** All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

**2.** That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

EXHIBIT B

## SERVICES AGREEMENT

This is a Services Agreement dated as of this 2nd day of June 2015 (this "Agreement") by and between Wm. Bolthouse Farms, Inc., having its principal office at 7200 E. Brundage Lane, Bakersfield, CA 93307 ("Company"), and Atkinson Staffing, having its principal office at 2505 W. Sylvester Street, Pasco, WA 93301 ("Vendor") (singularly, the "Party"; collectively, the "Parties".)

### BACKGROUND

Company desires to engage Vendor to perform certain temporary labor services; and Company and Vendor wish to define herein the terms and conditions under which Vendor will provide Company with such Services.

### TERMS

NOW, THEREFORE, in consideration of the mutual promises and conditions contained herein, the parties agree as follows:

1. **Term of Agreement**: This Agreement shall become effective as of the date written above and shall remain effective until June 1, 2016 unless extended by mutual agreement of the parties or terminated earlier in accordance with the terms of this Agreement.

2. **Services**:

   (a) Temporary Staffing: During the term of this Agreement, Vendor will provide temporary labor services for Company's Washington facility (the "Facility") in accordance with the terms of this Agreement under the overall supervision of Vendor's On-Site Facilitators as designated by Vendor, at the times and places and to the extent he or she reasonably specifies (the "Services"). Vendor acknowledges and agrees that Company makes no minimum commitment of work, time or compensation to Vendor hereunder. Company will request that Vendor provide the Services, if at all, only on an as-needed basis, such need to be determined in Company's sole discretion.

   (b) Vendor Payroll Services: At Company's request, Vendor will place individuals identified by Company on its payroll and report and make all appropriate withholdings, including but not limited to applicable state and local taxes, federal taxes, workers' compensation, FICA, federal and state unemployment insurance.

3. **Termination**: Vendor and Company each have the right to terminate this Agreement, without having or giving a reason, by giving thirty-five (35) days' advance notice to the other; provided, however, if Vendor fails to satisfy any of its obligations hereunder, Company has the right to terminate this Agreement effective immediately upon giving notice to Vendor. In the event of termination, Company will only be liable for payment of Services actually completed prior to the effective date of termination. Any amounts paid prospectively by Company for Services (e.g., up-front fees) not actually performed as of the date of termination shall be immediately returned to Company by Vendor.

4. **Company's Obligations**:

   (a) Compensation. Provided that Vendor fully performs its obligations hereunder, Company will pay to Vendor fees in accordance with the billing rate schedule on Exhibit A hereto. Vendor will invoice Company weekly at the rates agreed upon in this clause (a). Company will pay all duly submitted and undisputed invoices within thirty (30) days of the date of receipt of such invoice. All invoices should be sent to: c/o Accounts Payable or by email to accountspayable@bolthouse.com ,Wm. Bolthouse Farms, Inc., 7200 E. Brundage Lane, Bakersfield, CA 93307.

(b) _Expenses_. Company will reimburse Vendor for reasonable, out-of-pocket expenses which are incurred exclusively for the purposes of fulfilling Vendor obligations under this Agreement. Expense reimbursement will be contingent upon Company's prior approval of expenses and presentation by Vendor of reasonable documentation with respect thereto and verification thereof by Company.

(c) _Invoice Accuracy_. No payment by Company shall limit Company's right thereafter to contest the accuracy of any invoice or to reject any nonconforming or deficient Services or deliverables.

5. **Vendor's Representations and Warranties**: Vendor represents and warrants that:

(a) Vendor has the requisite skills and experience to perform the Services and all such Services shall be performed in a professional and workmanlike manner by qualified personnel;

(b) Vendor is free to enter into this Agreement and to fully perform its obligations hereunder;

(c) all deliverables produced by Vendor shall be delivered to Company free and clear of any lien, encumbrance or claim of ownership by any third party;

(d) no work performed by Vendor, nor any resulting deliverable, will violate or infringe upon the rights of any third party, including, without limitation, (i) proprietary and non-disclosure rights, (ii) copyrights, patent or other intellectual property rights, or (iii) contractual rights;

(e) Vendor shall comply with all applicable federal, state and local laws, rules and regulations that may be required to perform Services hereunder, including, without limitation, those regarding business permits and licenses;

(f) any deliverable upon delivery will conform to the terms of this Agreement;

(g) Vendor will correct, at its sole expense, any deficiency in any deliverable furnished to Company under this Agreement; and

(h) Vendor shall report and make all appropriate withholdings, including but not limited to applicable state and local taxes, federal taxes, workers' compensation, FICA, federal and state unemployment insurance, with respect to all compensation received by any employee of Vendor placed with Company under this Agreement.

6. **Acceptance**: Any Service performed or deliverable produced by Vendor for Company under this Agreement shall be subject to Company's reasonable satisfaction and approval. Company shall not be required to pay for any Service or deliverable reasonably deemed unacceptable by Company if such Service or deliverable does not meet the agreed-upon standards of service or acceptance criteria. Acceptance shall not be unreasonably withheld. With respect to any deliverable, Company shall notify Vendor of its acceptance or rejection within 30 days of receipt thereof. In the event of rejection, Vendor shall correct any deficiencies and resubmit such deliverable within five (5) business days of rejection for review by Company. If a deliverable is not accepted by Company within 60 days from the date of initial delivery to Company, Company may, at its option, reject, in whole or in part, the unaccepted deliverable and any deliverables previously accepted if they are part of the same project or Services, and Vendor shall refund to Company all payments made to Vendor by Company for such returned deliverables within 30 days of Vendor's receipt of such deliverables.

7. **Safety Gear & Uniforms**: Vendor acknowledges that all uniforms required by workers for the Services will be furnished by a uniforms vendor selected by Company and Company shall pay the weekly or monthly rental charge for such uniforms; provided, however, that Vendor shall be solely responsible for any lost or damaged uniforms. Company shall provide hair nets and ear plugs. Vendor employees must report to work in uniform, including approved safety shoes and safety glasses. Vendor shall be responsible for the recovery of reusable personal protective equipment ("PPE") and tools supplied to terminated workers, including, but not limited to safety glasses, knives, and respiratory equipment and other PPE supplies provided by Company. Vendor shall be responsible for any doctor consultation necessary in connection with the assignment of PPE.

8. **Drug Testing**: At Vendor's sole cost and expense, post-offer pre-employment drug testing shall be conducted before Vendor employees begin their assignment with the Company. Vendor also shall conduct reasonable suspicion and post-accident drug and alcohol testing. Vendor on-site facilitators must be trained to administer Vendor's drug/alcohol testing program, and Vendor shall have arrangements in place with a reputable drug testing and Medical Review Officer services provider which is able to come on premises to conduct drug tests and breath-alcohol tests when necessary. Vendor must submit to Company a copy of pre-employment, reasonable suspicion, and post-accident testing protocols and procedures.

9. **Screening/Background Check:** At Vendor's sole cost and expense, Vendor will be responsible for verifying (and re-verifying, where necessary) that Vendor's employees are eligible to work in the United States in compliance with the law. Company will have the right to audit employment eligibility documentation of Assigned Employees upon request. Vendor will conduct a post-offer pre-employment criminal background check of any worker contracted for temporary placement prior to the commencement of such placement. Company will provide Vendor with criminal background check guidelines to use in reviewing criminal backgrounds, and criminal convictions will only be considered to the extent that they are job-related. Vendor also will conduct DMV screenings for any Assigned Employee who may be required to drive a motor vehicle. Company will have access upon request to any of the above mentioned information and Vendor will be required to disclose to Company any criminal record, regardless of Company's request prior to assigning employee to Company's workplace.

10. **Wage and Hour Compliance:** Vendor will be responsible for providing appropriate supervision and maintaining all documentation necessary to ensure compliance with wage and hours laws, rules, and regulations. More specifically, Vendor will be responsible for ensuring that its employees are paid for all hours worked and that accurate records are maintained, thereof. Vendor also will be responsible for ensuring that (a) all of its employees are compensated in compliance with all applicable provisions of the California Labor Code, including providing employees required daily meal periods and rest breaks; (b) wages are timely issued each pay period; and (c) accurate wage statements each pay period contain all required information. Vendor will allow Company visibility to all records and provide Company with copies and/or access to audit these records at anytime. If Vendor installs a time clock in Company premises, it will be billed for the installation cost and also for any pre-wiring necessary. The installation costs vary depending on the exact location where the time clock will be installed.

11. **Security:** To the extent Vendor assigns any employees to Company's Brundage Facility, Vendor will create a distinguished badge of some sort to its employees for security purposes. Assigned Employees will not be allowed to come through the premises unless verified by security.

12. **Safety Logs**: Vendor shall maintain an OSHA log for all of its employees working at the Facility. Company will maintain an OSHA log for all of its employees working at the Facility. Company will have the right to audit any OSHA record keeping of Assigned Employees upon request.

13. **Training:** Vendor agrees to provide the following training for its employees, prior to Vendor employees commencing their assignment at Facility: New Hire Orientation, all applicable Safety Training including but not limited to Respiratory Training, Fall Protection, Emergency Awareness and Drug Free Workplace Policy. All safety related medical monitoring and medical records will be retained by the Vendor. Company will have the right to audit any training record keeping of Assigned Employees upon request.

14. **Disciplinary Action:** Vendor shall maintain a progressive discipline policy. Vendor shall provide to Company documentation on all disciplinary action policies, forms, and procedures Vendor will use for its employees on assignment at the Facility.

15. **Recognition & Performance:** Vendor shall maintain a recognition and rewards program. Vendor shall provide to Company documentation on all recognition policies, forms, and procedures Vendor will use for its employees on assignment at the Facility. Vendor must also maintain a performance feedback program for its employees at the Facility. Vendor shall provide to Company documentation on all performance feedback policies, forms, and procedures Vendor will use for its employees on assignment at the Facility.

16. **On-Site Facilitators/Leads**: Vendor must identify a Lead per shift per area as well as on-site facilitators to provide sufficient supervising personnel to supervise and control the work of Assigned Employees, premises, processes and systems to be performed by Assigned Employees and to review and approve the corresponding work

product. Company will have the right to audit staffing schedules of Facilitators and Leads upon request. The on-site facilitators should be able to be contacted by phone by Company's personnel. The on-site leads and facilitators shall be responsible for the following:

(a) Act as a liaison between the Vendor and the Company's department managers;
(b) Facilitate the recruitment and placement of Vendor staff at various departments within the Company's facility;
(c) Ensure all staff meet the qualifications for each position based upon the criteria provided by the Company;
(d) Communicate with the Company's human resources department and department managers to understand their staffing needs;
(e) Hand out staff time cards and ensure staff time cards are turned in on-time and that the hours reported accurately;
(f) Provide "hours reports" to the Company's human resources department; and
(g) "End the assignment" of any staff employee not meeting work standards
(h) Responsible for handling employee related issues
(i) Responsible for completing any accident, worker compensation reports

17. **Laws and Regulations**. Vendor guarantees that, in accepting and filling this Agreement, Vendor has complied and will comply with all applicable federal, state and local laws governing employees and the workplace, including but not limited to the federal Fair Labor Standard Act of 1938, as amended, including, without limitation, Section 12 (child labor provisions) and all state, federal and local laws regarding child labor, the California Labor Code, Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, the California Fair Employment and Housing Act, Section 503 of the Rehabilitation Act of 1973, Executive Order 11246, Section 402 of the Vietnam Veterans' Readjustment Assistance Act of 1974, the Occupational Safety and Health Act of 1970, as amended ("OSHA") (in the event of a conflict between the requirements of OSHA and any industry codes or standards applicable to this Purchase Order, the more stringent requirement shall apply), the federal Family and Medical Leave Act, and state and local laws regarding family or medical leaves, and the Patient Protection and Affordable Care Act.

Vendor also agrees that the following clauses from the Code of Federal Regulations shall also apply to this Agreement and shall be incorporated herein by reference: the Equal Employment Opportunity Clause, the Certification of Nonsegregated Facilities required by paragraph (7) of Executive Order 11246, the Utilization of Minority Business Enterprises and the Minority Business Enterprises Subcontracting Program clauses, the Affirmative Action for Handicapped Worker's clause, and the Affirmative Action for Disabled Veterans and Veterans of the Vietnam Era clause are, by this reference, incorporated herein and made part hereof.

18. **Reporting**: Vendor shall provide Company with quarterly updates on Key Performance Indicators as outlined and provided by Company, the receipt of which Vendor hereby acknowledges.

19. **Indemnification**: Vendor will indemnify, defend, and hold Company and its affiliates (and their officers, directors, employees and agents) harmless against any and all costs, losses, damages or expenses (including reasonable attorney's fees) that any of them may incur or be subjected to by reason of any claim, demand or suit arising out of Vendor's performance of the Services set forth in this Agreement, or by reason of any act or omission of Vendor or any of its employees, contractors or agents. Without limitation, this includes any claim, demand or suit for alleged violations of wage and hour laws or regulations or violations of any other provisions of the California Labor Code, including proceedings initiated by a government agency (e.g., U.S. Department of Labor, California Labor Commissioner, Labor and Workforce Development Agency).

20. **Insurance**: Vendor shall maintain, at its own expense, and will provide Company with an insurance certificate showing coverage for commercial general liability in the amount of $2,000,000 per occurrence and in the aggregate, and shall include the following coverages: (a) bodily injury, (b) property damage; (c) personal injury, and (d) contractual liability, and shall name Company as an additional insured. Vendor will also maintain, at its own expense, workers' compensation insurance with an Alternate Employer Endorsement in the amount subject to statutory requirements and employer's liability insurance at $1,000,000 per accident, per disease and per employee, and will provide Company with evidence of such coverage. Each policy shall (i) be maintained with insurers with a Best's rating of at least A, Financial Class Size VIII, and be reasonably acceptable to Company, (ii) provide that it cannot be cancelled or modified without thirty (30) days' advance written notice from the insurance company to

Company, (iii) be primary and noncontributory to any insurance maintained by Company, (iv) name Company as an additional insured under the general liability policy, and (v) provide a waiver of subrogation in Company favor for both general liability and workers' compensation. Original certificates of insurance evidencing such policies of insurance shall be delivered to Company prior to the effective date of this Agreement. Failure to deliver such certificates or failure of Company to demand such certificates shall not be considered a waiver or excuse performance under this provision. Vendor liability as stated in the Agreement is not limited by the scope or limits of any insurance policy or policies.

21. **Ownership**: All work product prepared, produced, conceived or made by Vendor or any of its employees, affiliates or agents as a result of the Services provided under this Agreement, including, without limitation, all concepts, designs, inventions, discoveries, ideas, processes, and any other materials (whether complete or incomplete, whether acceptable to Company or not, and regardless of the form they take) (collectively, "Work Product") will belong exclusively to Company  Vendor unconditionally assigns and transfers to Company all worldwide right, title, interest, and claim which Vendor now has or may in the future have to Work Product, including, but not limited to, any adaptations and derivative works thereof. Vendor waives any and all moral rights in any Work Product in perpetuity. To the extent that Work Product is or shall be regarded as "work made for hire" as that term is used in the United States copyright laws, all copyrights in and to Work Product shall belong to Company as "work made for hire". Vendor agrees to perform such acts or execute such agreements as may be necessary to affirm Company ownership in Work Product and full legal title therein, including executing any assignments, transfers or other documents reasonably necessary to effect the registration or ownership of any Work Product created hereunder. Vendor agrees to indemnify, defend and hold Company harmless from any claims of any of its individual employees, agents, subcontractors or any other third parties challenging Company's sole and exclusive ownership rights in and to all Work Product. Vendor shall have each of its employees and sub-contractors (as applicable) assign to Company, at the commencement of the Services to be performed hereunder, his or her rights to the Work Product produced, created or prepared in the course of providing the Services hereunder during the term of this Agreement, and shall ensure that no sub-contractor shall make any claims to Work Product.

22. **Confidentiality**:

(a) Any material or information, including but not limited to information relating to the business, products, marketing plans and policies of Company or its affiliates, supplied to Vendor by Company or its affiliates (either directly or indirectly, and in whatever form) or developed by Vendor in carrying out Services under this Agreement (collectively, "Confidential Information"), shall be deemed to be confidential and proprietary and the property of Company. During and after the term of this Agreement, Vendor agrees not to use Confidential Information for any purpose other than in furtherance of Services under this Agreement and not to provide or disclose Confidential Information to any third party without the prior written consent of Company. Vendor also agrees to have its employees sign a Confidentiality Agreement prior to commencing their assignment at the Facility.

(b) Confidential Information shall not include any information which (i) was already known to Vendor prior to the time of disclosure by Company, (ii) is available or becomes generally available to the public other than through a breach of this Agreement by Vendor, or (iii) is acquired or received rightfully and without confidential limitation by Vendor from a third party. If Vendor becomes or is required to disclose Confidential Information, or any part thereof, pursuant to any applicable law, regulation, court order or document discovery request, then Vendor will give Company prompt notice of such requirement. If Company waives compliance with the terms of this Agreement with respect to such disclosure or is unable to obtain a protective order or other appropriate remedy with respect to such disclosure, then Vendor will disclose only that portion of the Confidential Information necessary to ensure compliance with such legal requirement.

(c) Vendor agrees to return all Confidential Information to the Company, including, but not limited to, raw data, records, memoranda and reports, together with all photographic copies, handwritten notes, excerpts or other copies thereof promptly after request by Company, or, in any event, promptly upon expiration or termination of this Agreement.

23. **No Publicity**: Vendor may not use Company name or disclose the terms or existence of this Agreement to any third party, including on Vendor customer lists, press releases or otherwise, without Company's express prior

written consent in each and every instance. In addition, all such press releases or the use of Company name or any trademark of Company will require prior written approval by Company's Communications Department.

24. **Subcontractors**: Vendor shall not subcontract any of its duties or retain third parties to furnish services to Vendor, in connection with Vendor performance of this Agreement without the express prior written consent of Company. In the event Vendor is permitted to subcontract any of its obligations pursuant to this Section 24, Vendor will remain primarily liable for the performance of the Services hereunder and will ensure that such subcontractors comply with each of the terms and conditions of this Agreement. Vendor will indemnify, defend, and hold Company and its affiliates (and their officers, directors, employees and agents) harmless against any and all costs, losses, damages or expenses (including reasonable attorney's fees) that any of them may incur or be subjected to by reason of any claim, demand or suit arising out of any subcontractor's performance of the Services.

25. **Entire Agreement**: This Agreement constitutes the entire agreement between Vendor and Company with respect to their subject matter. Any prior arrangements, agreements, contracts, representations, warranties, purchase orders, bids, proposals, offers, or other communications, written or oral, are superseded and of no force or effect. This Agreement may not be changed, waived, discharged or terminated orally, but only by means of a writing signed by both Vendor and an authorized Company representative. If any term of this Agreement or the application thereof is found invalid, illegal or unenforceable, the remainder of this Agreement will remain in full force and effect.

26. **Assignment**: None of Vendor's rights or duties is assignable or delegable, in whole or in part, without Company's prior written consent, which consent Company may withhold without having or giving a reason.

27. **Governing Law**: This Agreement is governed by the laws of the State of California, without giving effect to conflict of law principles. Each Party consents exclusively to subject matter and in personam jurisdiction and venue in the United States District Court, Eastern District of California. If such court lacks subject matter jurisdiction, then each Party consents exclusively to in personam jurisdiction and venue in a court of competent jurisdiction in Kern County, California.

28. **Independent Contractor**: Vendor shall serve as an independent contractor to Company and Vendor shall have no authority or capacity to bind Company and its affiliates or to act on their behalf. This Agreement does not create a partnership between the parties hereto. Vendor expressly acknowledges for itself, its employees, agents and subcontractors, that none of its employees, agents or subcontractors are employees of Company and that none of its employees, agents or subcontractors are entitled to participate in any benefit plans of Company. Vendor further acknowledges that none of its employees, agents or subcontractors are eligible to participate in any such benefit plans, even if it is later determined that the status of any of them was that of an employee during the period of this engagement of Vendor by Company. Vendor, on behalf of itself and its employees, agents and subcontractors, hereby expressly waives any claim for benefits coverage attributable to the services provided under this Agreement.

29. **Notices**: Any notice given to a party under or in connection with this Agreement shall be in writing and shall be sent by hand delivery, overnight delivery service or certified or registered mail to the address of the applicable party first set forth above. Such notices shall be deemed given when received if personally delivered or three (3) business days after transmittal by registered or certified mail return receipt requested.

30. **Survival**: Sections 17, 18, 19, 20, 21, 22, 23, 25, 26 and 27 shall survive the expiration or termination of this Agreement.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first written above.

**Wm. Bolthouse Farms, Inc.**

By: _[signature]_
Name: Rachel Viramontes
Title: Vice President – Human Resources

Dated: June 15, 20 15

**Atkinson Staffing**

By: _[signature]_
Name: Michael Atkinson
Title: President

Dated: 6-5-15 , 20 15

6

## Exhibit A

**Company Name and Location:** <u>Atkinson Staffing, 2505 W. Sylvester Street, Pasco, WA 93301</u>

**Company Contact:** <u>Abraham Larios, Operations Manager, (509) 380-4172 or (509) 545-8500</u>

1.  **Job title(s) for which Vendor will be supplying Temporary Staffing:**

| |
|---|
| Bagger Operator |
| Forklift Operator |
| Graders/ Sorters |
| Master Packer |
| Production Worker |
| Sanitation Worker |

2.  **Hourly Rate of Pay and Mark-Up for Job title(s)**

| Job Title | Mark Up(%) |
|---|---|
| Bagger Operator | 40% |
| Forklift Operator | 40% |
| Graders/ Sorters | 40% |
| Master Packer | 40% |
| Production Worker | 40% |
| Sanitation Worker | 40% |

3.  <u>**Payroll Services**</u>

For individuals identified by Company for placement on Vendor's payroll, Vendor shall charge Company a \_\_% mark-up over the individual's rate of pay, billable on a monthly basis.

4.  **Hiring of Vendor's Employees**

    (a)  Company may hire an employee of Vendor at any time after 90 days of the commencement of a temporary placement and no fee shall be assessed.

    (b)  If Company hires an employee of Vendor prior to 90 days of the commencement of the temporary placement, Company shall pay Vendor a fee equal to 20% of the employee's annual salary when employee has been 0-30 days on assignment, 15% when employee has been 31-60 days on assignment, and 10% when employee has been 61-90 days on assignment. This fee shall be reduced on a pro-rated basis for placement weeks completed.

    (c)  If, at any time within one (1) year of a hiring a Vendor employee pursuant to paragraph 4(b), such Vendor employee voluntarily terminates his or her employment with Company or (ii) Company terminates his/her employment for unsatisfactory performance or misconduct as determined at Company's discretion, then Vendor shall return any fee paid pursuant to paragraph 4(b).

*This Exhibit A is governed by, incorporated into, and made a part of the Services Agreement dated as of June 02, 2015 (the "Agreement") between Vendor and Company In the event of a conflict between this Exhibit and the Agreement, this Exhibit A shall prevail.*

EXHIBIT C

 **CT Corporation**

**TO:** James C. Guyon, Senior Litigation Paralegal
Campbell Soup Company
1 Campbell Pl
Camden, NJ 08103-1799

**RE:** **Process Served in Washington**

**FOR:** Wm. Bolthouse Farms, Inc.  (Domestic State: MI)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | DAVID LICONA LARA, ETC., PLTF. vs. WM. BOLTHOUSE FARMS, INC., ETC., ET AL., DFTS. |
| **DOCUMENT(S) SERVED:** | ORDER, SUMMONS, COMPLAINT, INTERROGATORIES, CERTIFICATION, REQUESTS |
| **COURT/AGENCY:** | Benton County Superior Court, WA<br>Case # 182009780 |
| **NATURE OF ACTION:** | Personal Injury - Breached a duty owed to plaintiff Licona Lara by negligently failing to follow or enforce Washington State legal and industry safety standards and protocols. |
| **ON WHOM PROCESS WAS SERVED:** | CT Corporation System, Olympia, WA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 04/23/2018 at 14:57 |
| **JURISDICTION SERVED :** | Washington |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days after service of this Summons, excluding the day of service |
| **ATTORNEY(S) / SENDER(S):** | Mistee R. Verhulp<br>Smart Law Offices, P.S.<br>309 North Delaware Street<br>P.O. Box 7284<br>Kennewick, WA 99336<br>509-735-5555 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 04/25/2018, Expected Purge Date: 04/30/2018<br><br>Image SOP<br><br>Email Notification,  James C. Guyon  jim_guyon@campbellsoup.com |
| **SIGNED:** | CT Corporation System |
| **ADDRESS:** | 711 Capitol Way S.<br>Suite 204<br>Olympia, WA 98501 |
| **TELEPHONE:** | 602-277-4792 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.



JOSIE DELVIN
BENTON COUNTY CLERK

APR 16 2018

FILED

RECEIVED
APR 20 2018
KENNEWICK

SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR <u>BENTON</u> AND FRANKLIN COUNTIES

David Licona Lara )
)
)
Plaintiff(s), )
)
v. )
)
WM Bolthouse Farms et al )
)
Defendant(s). )

Case No. **1 8 - 2 - 0 0 9 7 8 - 0**

CIVIL CASE SCHEDULE ORDER
(ORSCS)

I. SCHEDULE
**(Week of 04/16/2018 )**

|  |  | DUE DATE |
|---|---|---|
| 1 | Cancellation/Confirmation of Status Conference | 08/06/2018 |
| 2 | Status Conference (telephonic) | **09/06/2018** |
| 3 | Plaintiff's Disclosure of Lay and Expert Witnesses | 09/04/2018 |
| 4 | Defendant's Disclosure of Lay and Expert Witnesses | 10/29/2018 |
| 5 | Last Date for Filing Statement of Arbitrability | 11/13/2018 |
| 6 | Disclosure of Plaintiff's Rebuttal Witnesses | 11/13/2018 |
| 7 | Disclosure of Defendant's Rebuttal Witnesses | 11/26/2018 |
| 8 | Discovery Completed | 02/04/2019 |
| 9 | Last Date for Filing Jury Demand | 02/19/2019 |
| 10 | Settlement Position Statements filed by all parties | 02/19/2019 |
| 11 | Last Date for Hearing Dispositive Pretrial Motions | 03/04/2019 |
| 12 | Settlement Conference (in person) | **03/21/2019** |
| 13 | Last Date for Filing and Serving Trial Management Report | 04/01/2019 |
| 14 | Pretrial Management Conference (in person) | **04/04/2019** |
| 15 | Trial Memoranda and Motions In Limine to be filed | 04/01/2019 |
| 16 | Trial Date and Motions in Limine | **04/15/2019** |

II. ORDER

**IT IS ORDERED** that all parties comply with the foregoing schedule.

CIA
Verhulp

Dated this 16 day of April ,2018.

CAMERON MITCHELL
SUPERIOR COURT JUDGE

NOTICE TO PLAINTIFF:
The plaintiff may serve a copy of the Case Schedule Order on the defendant(s) along with the summons and complaint.
Otherwise, the plaintiff shall serve the Case Schedule Order on the defendant(s) within ten (10) days after the latter of: (1) the
filing of the summons and complaint or (2) service of the defendant's first response to the complaint, whether that response is
a Notice of Appearance, an Answer, or a CR 12 Motion.

1

2

3

4

5

6

7

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF BENTON

8

9

10   DAVID LICONA LARA, a single person,

11              Plaintiff,                          Cause No.: 18-2-00978-0

12   vs.

13   WM. BOLTHOUSE FARMS, INC., a            **SUMMONS**
     SUBSIDIARY OF CAMPBELL SOUP CO., a
14   foreign corporation; XYZ CORPORATIONS;
     and JANE DOE and JOHN DOE
15   EMPLOYEES 1-10,

16              Defendants.

17   **TO:        WM. BOLTHOUSE FARMS, INC.;**

18        A lawsuit has been started against you in the above-entitled court by the above-named

19   Plaintiff.  The Plaintiff claim is stated in the written Complaint for Damages, a copy of which is

20   served upon you with this Summons.

21        In order to defend against this lawsuit, you must respond to the Complaint for Damages by

22   stating your defense in writing, and serve a copy upon the person signing this Summons within

23   twenty (20) days after the service of this Summons, excluding the day of service if served within

24   the State of Washington, or within sixty (60) days after service of this Summons, excluding the day

25   of service if served outside the State of Washington, or a default judgment may be entered against

26

SUMMONS - 1

SMART LAW OFFICES, P.S.
309 N. Delaware St./PO Box 7284
Kennewick WA 99336
509-735-5555/FAX 509-735-2073

you without notice. A default judgment is one where Plaintiff is entitled to what they ask for because you have not responded. If you serve a Notice of Appearance on the undersigned person, you are entitled to notice before a default judgment may be entered.

You may demand that the Plaintiff file this lawsuit with the court. If you do so, the demand must be in writing and must be served upon the person signing this Summons. Within fourteen (14) days after you serve the demand, the Plaintiff must file this lawsuit with the court, or the service on you of this Summons and Complaint for Damages will be void.

If you wish to seek the advice of an attorney in this matter, you should do so promptly so that your written response, if any, may be served on time.

This Summons is issued pursuant to Rule 4 of the Superior Court Civil Rules of the State of Washington.

Dated this 16th of ___April_____, 2018.

SMART LAW OFFICES, P.S.

Mistee R. Verhulp, WSBA# 2935[]
Attorney for Plaintiff Licona Lara

FILE RESPONSE WITH:

CLERK OF THE COURT
Benton County Superior Court
7122 West Okanogan Place, Bld A
Kennewick, WA 99336
Telephone: 509-735-8388

SERVE A COPY OF YOUR RESPONSE ON:

Mistee R. Verhulp
Attorney at Law
Smart Law Offices, P.S.
309 North Delaware Street
P.O. Box 7284
Kennewick, WA 99336
Telephone: 509-735-5555

JOSIE DELVIN
BENTON COUNTY CLERK

APR 16 2018

FILED

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF BENTON

| | |
|---|---|
| DAVID LICONA LARA, a single person,<br><br>      Plaintiff,<br><br>vs.<br><br>WM. BOLTHOUSE FARMS, INC., a SUBSIDIARY OF CAMPBELL SOUP CO., a foreign corporation; XYZ CORPORATIONS; and JANE DOE and JOHN DOE EMPLOYEES 1-10,<br><br>    Defendants. | Cause No.: 18-2-00978-0<br><br>**COMPLAINT FOR DAMAGES** |

COMES NOW the plaintiff, DAVID LICONA LARA, by and through his attorney of record, Mistee R. Verhulp and SMART LAW OFFICES, P.S., and allege as follows:

**I.**

1.1 Plaintiff David Licona Lara is a single person that at all times relevant hereto resided in Yakima County, Washington.

1.2 WM. Bolthouse Farms, Inc., at all times relevant hereto, was a subsidiary of Campbell Soup Co., a for-profit Michigan corporation, doing business in Benton County, Washington. All acts and omissions of defendant alleged herein were made for the benefit of defendant's business operations.

COMPLAINT FOR DAMAGES - 1

SMART LAW OFFICES, P.S.
309 N. Delaware Street
Kennewick, WA 99336
Tel:509-735-5555 / Fax: 509-735-2073

1.3     Defendants XYZ Corporations are corporations or businesses which designed, manufactured, installed, maintained, altered, performed work on the subject conveyor belt, and/or was in charge of or assisted with the operation, management, training, safety and/or supervision of the subject conveyor belt or employees or agents operating the subject conveyor belt.

1.4     JANE DOE and JOHN DOE EMPLOYEES 1-10 are employees and/or agents of a defendant whose acts and omissions in this matter were within the course and scope of their employment and for the benefit of a defendant's business operations.

## II.

2.1     All acts and omissions alleged herein occurred in Benton County, Washington.

2.2     Jurisdiction and venue are proper with this Court pursuant to RCW 4.28 et. seq.

## III.

3.1     In July of 2015, plaintiff David Licona Lara was an employee of Atkinson Staffing, Inc.

3.2     Defendant WM. Bolthouse Farms, Inc., acting as a subsidiary of Campbell Soup Co., contracted with Atkinson Staffing, Inc. to provide temporary laborers at one or more of its business locations in Benton County, Washington.

3.3     On or about July 7, 2015, Atkinson Staffing, Inc. sent plaintiff David Licona Lara to work at one of WM. Bolthouse Farms, Inc. business locations in Prosser, Benton County, Washington.

3.4     Plaintiff David Licona Lara was assigned by one or more of the defendants to do sanitation work on a portion of a conveyor belt system with a pick wheel.

COMPLAINT FOR DAMAGES - 2

3.5     Plaintiff David Licona Lara was given a yellow jacket to wear by one or more of the defendants to do sanitation work on a portion of a conveyor belt system.

3.6     Plaintiff Licona Lara received minimal training by an employee and/or agent for one or more of the defendants on how to do sanitation work on the portion of the conveyor belt system he was assigned.

3.7     Plaintiff Licona Lara was trained by an employee and/or agent for one or more of the defendants to leave the conveyor belt system on when performing sanitation work on the portion of the conveyor belt system he was assigned.

3.8     On or about July 15, 2015, the yellow jacket plaintiff Licona Lara was wearing got caught on the pick wheel at a pinch point in the conveyor belt system while performing sanitation work on the portion of the conveyor belt system he was assigned.

3.9     Plaintiff Licona Lara was pulled into the conveyor belt system and sustained serious bodily injury before an emergency stop button could be located and pushed by another laborer.

3.10    Plaintiff Licona Lara sustained serious bodily injuries as a result of this incident.

## IV.

4.1     Defendants, by and through employees, agents, and/or subcontractors, breached a duty owed to plaintiff Licona Lara by negligently failing to exercise reasonable care in protecting him from injury.

4.2     Defendants, by and through employees, agents, and/or subcontractors, breached a duty owed to plaintiff Licona Lara by negligently failing to adequately train and/or supervise its employees, agents or subcontractors regarding job-site safety.

COMPLAINT FOR DAMAGES - 3

SMART LAW OFFICES, P.S.
309 N. Delaware Street
Kennewick, WA 99336
Tel:509-735-5555 / Fax: 509-735-2073

4.3     Defendants, by and through employees, agents, and/or subcontractors, breached a duty owed to plaintiff Licona Lara by negligently creating the dangerous or hazardous condition which proximately caused the plaintiff's injuries.

4.4     Defendants, by and through employees, agents, and/or subcontractors, breached a duty owed to plaintiff Licona Lara by negligently failing to adequately warn him of the dangerous condition.

4.5     Defendants, by and through employees, agents, and/or subcontractors, breached a duty owed to plaintiff Licona Lara by negligently failing to follow or enforce its own safety policies, procedures, and protocols.

4.6     Defendants, by and through employees, agents, and/or subcontractors, breached a duty owed to plaintiff Licona Lara by negligently failing to follow or enforce Washington State legal and industry safety standards and protocols.

4.7     Defendants, by and through employees, agents, and/or subcontractors, breached a duty owed to plaintiff Licona Lara by negligently failing to have reasonably safe equipment, practices, methods, operations and procedures in place to protect plaintiff from bodily injury.

4.8     Defendants, by and through employees, agents, and/or subcontractors, negligently designed, installed, maintained, altered, and/or performed work on the subject conveyor belt system.

4.9     Defendants, by and through employees, agents, and/or subcontractors, negligently operated, managed, trained, and/or supervised the subject conveyor belt system or laborers operating the subject conveyor belt system.

COMPLAINT FOR DAMAGES - 4

SMART LAW OFFICES, P.S.
309 N. Delaware Street
Kennewick, WA  99336
Tel:509-735-5555 / Fax: 509-735-2073

4.10    Defendants, by and through employees, agents, and/or subcontractors, negligently failed to discover the condition and realize that it involved a foreseeable and/or unreasonable risk of harm to plaintiff.

4.11    Defendants, by and through employees, agents, and/or subcontractors, negligently failed to make such repairs, safeguards, or warnings necessary so as to cure, negate or protect plaintiff from the dangerous, defective and/or hazardous condition.

## V.

5.1    As a direct and proximate cause of the negligence and negligent actions of the Defendants, their employees, agents, or subcontractors, plaintiff David Licona Lara suffered damages, which include but are not limited to significant bodily injuries, permanent physical and/or mental disability, pain, suffering, scarring, emotional trauma, significant impact on life, past and future medical expenses, loss of earnings, loss of earning capacity, out-of-pocket expenses, and other damages.

## VI.

**WHEREFORE**, plaintiff prays for a judgment against the defendants, jointly and severally, in an amount that will fairly compensate the plaintiff for all damages sustained, costs and reasonable attorney fees, interest calculated at the maximum amount allowable by law, and such other relief as this court deems just.

//

//

//

COMPLAINT FOR DAMAGES - 5

SMART LAW OFFICES, P.S.
309 N. Delaware Street
Kennewick, WA 99336
Tel:509-735-5555 / Fax: 509-735-2073

**DATED** this ___16ᵃ___ day of ___April___, 2018.


SMART LAW OFFICES, P.S.


MISTEE R. VERHULP, WSBA# 29361
Attorney for Plaintiff Licona Lara

COMPLAINT FOR DAMAGES - 6

1

2

3

4

5

6

7          **IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
                    **IN AND FOR THE COUNTY OF BENTON**
8

9

10   DAVID LICONA LARA, a single person,

11              Plaintiff,                        Cause No.: 18-2-00978-0

     vs.
12                                                **PLAINTIFFS' FIRST SET OF**
     WM. BOLTHOUSE FARMS, INC., a                 **INTERROGATORIES AND REQUESTS**
13   SUBSIDIARY OF CAMPBELL SOUP CO., a            **FOR PRODUCTION OF DOCUMENTS**
     foreign corporation; XYZ CORPORATIONS;       **TO DEFENDANT WM. BOLTHOUSE**
14   and JANE DOE and JOHN DOE                     **FARMS, INC.**
     EMPLOYEES 1-10,
15
                Defendants.
16
     **TO:          WM. BOLTHOUSE FARMS, INC., Defendant;**
17
     **AND TO:      Legal Counsel for Defendant.**
18

19
          In accordance with CR 26, CR 33, and relevant local rules, please answer the
20   following interrogatories and requests for production separately and fully under oath
     within thirty (30) days of the date of service of these interrogatories upon you.
21
          These interrogatories and requests for production are to be treated as continuing in
22   nature. If information is not available within the time limits of the above-referenced
     rules, you must answer each interrogatory and request for production as fully as possible
23   within the time limit and furnish additional information when it becomes available. If
     there are any additions, deletions, or changes in the answers or information provided at
24   any time prior to trial, you are specifically requested to so immediately inform this
25

26   **PLAINTIFFS' FIRST SET OF**                      SMART LAW OFFICES, P.S.
     **INTERROGATORIES AND REQUESTS FOR**            309 N. Delaware St./PO Box 7284
     **PRODUCTION OF DOCUMENTS TO**                      Kennewick WA 99336
     **DEFENDANT WM. BOLTHOUSE FARMS, INC. 1**       509-735-5555/FAX 509-735-2073

1  defendant. If additional information is discovered between the time of making these
2  answers and the time of trial, these interrogatories and requests for production are
   directed to that information. If such information is not furnished, the undersigned will
3  move at the time of trial to exclude from evidence any information requested and not
   furnished.
4
   These interrogatories and requests for production are directed to the above named
5  parties and to their attorneys, and the answers shall include all information known to said
   parties and their attorneys.
6
7  When used in these interrogatories and requests for production, the term
   "document" means any book, pamphlet, periodical, letter, report, memorandum, notation,
8  message, telegram, cable, record, study, working paper, chart, graph, index, tape,
   minutes, contract, lease, invoice, record of purchase sale, correspondence, electronic or
9  other transcription of taping of telephone or personal conversations or conferences, or
   any and all other written, printed, typed, taped, punched, filmed or graphic matter
10 however produced or reproduced.

11 The term "identify" when used in reference to any individual person means to
   state his or her full name and present address if known, his or her present position and
12 business affiliation if known, and each prior position and business affiliation if known.
   "Identity" when used in reference to any documents means to state the type and author
13 (or, if different, the signer or signers), the address, the type of document (example: letter,
   memorandum, telegram, etc.), and all other means of identifying it with sufficient
14 particularity to meet the requirements for its inclusion in a request for production
15 pursuant to the Rules for Civil Procedure, and its present or last known location or
   custodian. If any such document was, or no longer is in the possession or subject to your
16 control, state what disposition was made of it, and the reason for such disposition.

17 If the space provided for each answer is not adequate, please complete your
   answer on an additional sheet of paper.
18
19 **DATED** this 18th day of April, 2018.

20                                            SMART LAW OFFICES, P.S.

21

22                                            MISTEE R. VERHULP, WSBA #29351
                                              Attorney for Plaintiff
23

24

25

26 **PLAINTIFFS' FIRST SET OF**                    SMART LAW OFFICES, P.S.
   **INTERROGATORIES AND REQUESTS FOR**          309 N. Delaware St./PO Box 7284
   **PRODUCTION OF DOCUMENTS TO**                     Kennewick WA  99336
   **DEFENDANT WM. BOLTHOUSE FARMS, INC. 2**    509-735-5555/FAX 509-735-2073

## INTERROGATORIES

INTERROGATORY NO. 1:

Please identify by name, address, telephone number, employer and job title each person who was consulted or who assisted in the answering of these discovery requests, or who furnished information, which was used in answering them.

     ANSWER:

INTERROGATORY NO. 2:

     Please state the following with respect to WM. Bolthouse Farms, Inc.

     (a)    Date of formation;
     (b)    State of incorporation;
     (c)    Business address;
     (d)    The names, addresses and telephone numbers of all Officers;
     (e)    The Washington Unified Business Number;
     (f)    Current legal formation status; and
     (g)    Current legal owners of the business.

     ANSWER:

     **REQUEST FOR PRODUCTION NO. 1**: Please produce documents in your possession which confirm your response to the preceding interrogatory.

     **RESPONSE:**

INTERROGATORY NO. 3:

PLAINTIFFS' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO
DEFENDANT WM. BOLTHOUSE FARMS, INC. 3

SMART LAW OFFICES, P.S.
309 N. Delaware St./PO Box 7284
Kennewick WA 99336
509-735-5555/FAX 509-735-2073

Please state the following with respect to WM. Bolthouse Farms, Inc.

(a)    Each date the business has been sold or changed ownership;
(b)    List of business owners with corresponding years of ownership; and
(c)    All names which company has done business as (i.e. any dba).


ANSWER:




**REQUEST FOR PRODUCTION NO. 2:** Please produce documents in your possession which confirm your response to the preceding interrogatory.

**RESPONSE:**




INTERROGATORY NO. 4:

    If Defendant claims there is some person or entity who is not a party to this lawsuit whose fault is alleged to have caused or contributed to plaintiff's injuries or damages, please state with particularity each person or entity and the basis for this claim.




**REQUEST FOR PRODUCTION NO. 3:** Please produce any and all documents in your possession which support your response to the preceding interrogatory.


**RESPONSE:**




**PLAINTIFFS' FIRST SET OF**
**INTERROGATORIES AND REQUESTS FOR**
**PRODUCTION OF DOCUMENTS TO**
**DEFENDANT WM. BOLTHOUSE FARMS, INC. 4**

**SMART LAW OFFICES, P.S.**
**309 N. Delaware St./PO Box 7284**
**Kennewick WA 99336**
**509-735-5555/FAX 509-735-2073**

| | |
|---|---|
| 1 | **INTERROGATORY NO. 5:** State whether or not you have ever been involved in a lawsuit |
| | in the past five years. If so, state as to each lawsuit: |
| 2 | a. The nature of the lawsuit; |
| 3 | b. The name and address of the party, person or entity against whom the |
| | lawsuit was brought; |
| 4 | c. The approximate date the lawsuit was filed; |
| | d. The date of disposition of the case; |
| 5 | e. The name and address of the attorney who represented you, and; |
| | f. The disposition of the case. |
| 6 | |
| 7 | **ANSWER:** |

INTERROGATORY NO. 5: State whether or not you have ever been involved in a lawsuit in the past five years. If so, state as to each lawsuit:

  a. The nature of the lawsuit;

  b. The name and address of the party, person or entity against whom the lawsuit was brought;

  c. The approximate date the lawsuit was filed;

  d. The date of disposition of the case;

  e. The name and address of the attorney who represented you, and;

  f. The disposition of the case.

ANSWER:

INTERROGATORY NO. 6: Please state as follows as to each written or recorded statement known to you regarding the allegations contained in plaintiff's complaint or the subject matter of this lawsuit, regardless of whether you assert that the statement is discoverable:

  a. Name, address, telephone number, employer and job title of the person who gave the statement;

  b. Name, address, telephone number, employer and job title of the person who took the statement;

  c. Date of statement;

  d. Form of the statement (e.g., whether hand written, recorded, transcribed, etc.);

  e. Subject matter of the statement;

  f. If you assert that the statement is not discoverable, state your basis for that position;

  g. Identify by name, address, telephone number and job title each person who has knowledge of the content of the statement of who has possession of the statement.

  h. If a copy of the statement cannot be produced under request for production no. 4, please identify the last known custodian of the statement.

ANSWER:

**PLAINTIFFS' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO
DEFENDANT WM. BOLTHOUSE FARMS, INC. 5**

**REQUEST FOR PRODUCTION NO. 4:** Please produce any and all documents in your possession which relate to your response to the preceding interrogatory.

**RESPONSE:**

INTERROGATORY NO. 7:

Does Defendant or it's insurer have knowledge of any written report, statement, memorandum, recording or testimony from the plaintiff, whether signed or not and whether or not prepared by someone other than plaintiff, concerning this cause of action or the incident giving rise to this cause of action, regardless of whether discoverable or not? If so, state the following as to each:

   a.   The name of the person from whom the statement was taken;
   b.   The hour, date and place of the taking of the statement;
   c.   Whether the statement was signed or unsigned; and
   d.   The present location of any such written statement or recording.

ANSWER:

**REQUEST FOR PRODUCTION NO. 5:** Please produce any and all documents in your possession which relate to your response to the preceding interrogatory.

**RESPONSE:**

INTERROGATORY NO. 8: Please identify by name, address, telephone number, employer and job title each person known to Defendant who witnessed the incident alleged in plaintiff's complaint.

ANSWER:

**PLAINTIFFS' FIRST SET OF**
**INTERROGATORIES AND REQUESTS FOR**
**PRODUCTION OF DOCUMENTS TO**
**DEFENDANT WM. BOLTHOUSE FARMS, INC. 6**

**SMART LAW OFFICES, P.S.**
**309 N. Delaware St./PO Box 7284**
**Kennewick WA 99336**
**509-735-5555/FAX 509-735-2073**

INTERROGATORY NO. 9: For each Affirmative Defense you are asserting, please state as to each:

      a.    All facts upon which you base your affirmative defense.
      b.    Name, address, telephone number, employer and job title of each person
            believe to have specific knowledge concerning the affirmative defense;
      c.    Identify all documents pertaining to, supporting or evidencing the
            affirmative defense, and identify all custodians thereof.

    ANSWER:


**REQUEST FOR PRODUCTION NO. 6:** Please produce any and all documents in your possession which relate to your response to the preceding interrogatory.


    **RESPONSE:**



INTERROGATORY NO. 10: State the names, addresses, telephone numbers, present occupation and present location of any persons Defendant believes has specific knowledge of the facts and circumstances surrounding the incident giving rise to this action.

    ANSWER:



INTERROGATORY NO. 11: As to each person identified in response to the proceeding Interrogatory, please:

(a) Describe in detail the content of their knowledge; and
(b) The basis for that person's knowledge.


    ANSWER:

PLAINTIFFS' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO
DEFENDANT WM. BOLTHOUSE FARMS, INC. 7

SMART LAW OFFICES, P.S.
309 N. Delaware St./PO Box 7284
Kennewick WA 99336
509-735-5555/FAX 509-735-2073

INTERROGATORY NO. 12: Please state the name, address, telephone number and title of all persons known to you who were working on or near the subject conveyor belt system at the time of the incident giving rise to this action.

ANSWER:

NTERROGATORY NO. 13: If a verbal or written report was made by an employee or agent of yours with respect to plaintiff's accident, state the name and address of the person who made the report, the date the report was made, and to whom the report was made.

ANSWER:

**REQUEST FOR PRODUCTION NO. 7:** Please produce a copy of all documents, emails or other data which confirm your response to the proceeding Interrogatory.

**RESPONSE:**

INTERROGATORY NO. 14: Please list any observations made of the plaintiff and his condition at the scene of the incident giving rise to this action by any agent or employee of the Defendant, including:

a. Physical injuries; and
b. The emotional or mental condition of the plaintiff, including in your answer whether or not the plaintiff was crying, talking, complaining of pain, or otherwise appearing mentally disturbed.

ANSWER:

**PLAINTIFFS' FIRST SET OF**
**INTERROGATORIES AND REQUESTS FOR**
**PRODUCTION OF DOCUMENTS TO**
**DEFENDANT WM. BOLTHOUSE FARMS, INC. 8**

SMART LAW OFFICES, P.S.
309 N. Delaware St./PO Box 7284
Kennewick WA 99336
509-735-5555/FAX 509-735-2073

INTERROGATORY NO. 15: Please describe in detail any and all conversations, sounds, utterances, speech or noises made by the Plaintiff after the subject incident, which were heard by you or by any agent or employee of the Defendant.

ANSWER:

INTERROGATORY NO. 16: Please state whether or not you or any agent or employee of the Defendant rendered any help or assistance of any kind to the Plaintiff immediately after the subject incident.

ANSWER:

INTERROGATORY NO. 17: If your answer to the preceding interrogatory is in the affirmative, please give:

a. A full and complete description of what help or assistance was rendered;
b. The identification, including physical appearance and name and address of each person who rendered any such help or assistance to the plaintiff.

ANSWER:

INTERROGATORY NO. 18: For each person, employee, business or other entity Defendant believes to be responsible for the care and maintenance of the conveyor belt system at the time the subject incident occurred, please list:

a. Name;
b. Last known address;
c. Name of contact person for defendant or person in charge;
d. Whether or not said individuals are still employed with defendant or business entity.

ANSWER:

PLAINTIFFS' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO
DEFENDANT WM. BOLTHOUSE FARMS, INC. 9

SMART LAW OFFICES, P.S.
309 N. Delaware St./PO Box 7284
Kennewick WA 99336
509-735-5555/FAX 509-735-2073

1    **REQUEST FOR PRODUCTION NO. 8:** Please produce a copy of any
     document which supports your answer to the preceding Interrogatory.
2
3        **RESPONSE:**

4

5    INTERROGATORY NO. 19:   If you allege there were any posted warnings, posted
     restrictions on use of the conveyor belt system, or other similar document, poster, or
6    other tangible item in the area where this incident occurred, please:

7    a)  Identify each item;
     b)  State where each item was located;
8    c)  State when each item was placed in that location;
     d)  State who placed the item in that location, giving that person's name, title, address,
9    and telephone number;
     e)  State why the item was placed in that location; and
10   f)  Whether the item has since been moved from that location.

11       ANSWER:
12

13

14

15   INTERROGATORY NO. 20:   How many injury incidents have occurred at this business
     location of WM. Bolthouse Farms, Inc. in the ten years prior to and ten years subsequent
16   to that of the plaintiff's incident which is the subject of this action?

17       ANSWER:
18

19

20
         **REQUEST FOR PRODUCTION NO. 9:** Please produce a copy of any records,
21   reports or other data (paper or electronically stored) which support your answer to the
     preceding interrogatory.
22
         **RESPONSE:**
23

24

25

26   PLAINTIFFS' FIRST SET OF                          SMART LAW OFFICES, P.S.
     INTERROGATORIES AND REQUESTS FOR            309 N. Delaware St./PO Box 7284
     PRODUCTION OF DOCUMENTS TO                       Kennewick WA 99336
     DEFENDANT WM. BOLTHOUSE FARMS, INC. 10     509-735-5555/FAX 509-735-2073

INTERROGATORY NO. 21: For each person, employee, business or other entity Defendant believes to be responsible for site safety of the conveyor belt system at the time the subject incident occurred, please list:

    a.  Name and address of person(s);
    b.  Telephone number of person(s);
    c.  Job title of person(s).

ANSWER:

INTERROGATORY NO. 22: For each formal or informal internal investigation known by defendant to have been conducted regarding the subject incident, please state for each:

    a.  Name and address of person;
    b.  Job title of person;
    c.  Company in which person was employed;
    d.  Contact information for person;
    e.  At whose request investigation was conducted; and
    f.  Whether anything in writing was drafted documenting the investigation.

ANSWER:

    **REQUEST FOR PRODUCTION NO. 10**: Please produce a copy of any records, reports or other data (paper or electronically stored) which is associated with your answer to the preceding interrogatory.

    **RESPONSE**:

INTERROGATORY NO. 23: For each employee or agent of defendant interviewed as part of any investigation of the subject incident, please state:

**PLAINTIFFS' FIRST SET OF**
**INTERROGATORIES AND REQUESTS FOR**
**PRODUCTION OF DOCUMENTS TO**
**DEFENDANT WM. BOLTHOUSE FARMS, INC. 11**

**SMART LAW OFFICES, P.S.**
**309 N. Delaware St./PO Box 7284**
**Kennewick WA 99336**
**509-735-5555/FAX 509-735-2073**

a. Name and address of person(s);
b. Telephone number of person(s);
c. Job title of person(s);
d. Date of interview;
e. Basis for knowledge; and
f. Summary of information known.

<u>ANSWER</u>:


**REQUEST FOR PRODUCTION NO. 11**: Please produce a copy of any written or recorded statements set forth in your answer to the preceding interrogatory.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 12:** Please provide a complete copy of all time cards (or other written documentation which is the equivalent of a time card) for all employees working on July 15, 2015.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 13:** Please provide a copy of any contract or agreement in effect with plaintiff's employer, Atkinson Staffing, at the time of the subject incident.

**RESPONSE:**


**PLAINTIFFS' FIRST SET OF**
**INTERROGATORIES AND REQUESTS FOR**
**PRODUCTION OF DOCUMENTS TO**
**DEFENDANT WM. BOLTHOUSE FARMS, INC. 12**

**SMART LAW OFFICES, P.S.**
**309 N. Delaware St./PO Box 7284**
**Kennewick WA  99336**
**509-735-5555/FAX 509-735-2073**

**REQUEST FOR PRODUCTION NO. 14:** Please provide a complete copy of any employment or payroll documents in your possession regarding the any work performed at a Wm. Bolthouse Farms, Inc. location by this plaintiff.

**RESPONSE:**

INTERROGATORY NO.24:

Please list the exact hours worked by all persons at that location of WM. Bolthouse Farms, Inc. on July 15, 2015.

ANSWER:

**REQUEST FOR PRODUCTION NO. 15:** Please produce a copy of any and all documents which substantiate your response to the preceding interrogatory.

**RESPONSE:**

INTERROGATORY NO. 25: Do any insurance or indemnification policies exist that provided coverage of either the defendant and/or its employees and agents and/or exist that may satisfy part or all of a judgment that may be entered in this action; or to indemnify or reimburse for payments made to satisfy such judgment? If so, please state as to each insurance agreement or policy its complete contents, including (*THIS IS MEANT TO ENCOMPASS LIABILITY POLICIES, UMBRELLA POLICIES, ADDITIONAL INSURED CERTIFICATES, OR ANY OTHER TYPE OF INSURANCE COVERAGE THAT WAS IN EXISTANCE AT THE TIME OF THE SUBJECT INCIDENT*):

    a. Name, address and telephone number of insurer or indemnitor;
    b. Name, address and telephone number of each named insured or indemnitee;
    c. Each type of coverage provided;
    d. Limits of each type of coverage provided;

PLAINTIFFS' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO
DEFENDANT WM. BOLTHOUSE FARMS, INC. 13

SMART LAW OFFICES, P.S.
309 N. Delaware St./PO Box 7284
Kennewick WA 99336
509-735-5555/FAX 509-735-2073

e. Amount of deductible on each coverage;
f. Policy period coverage;
g. Policy number.

ANSWER:

**REQUEST FOR PRODUCTION NO. 16:** Please produce a copy of all documents listed in the preceding response (THIS IS MEANT TO INCLUDE all insurance policies and indemnification agreements, declaration pages, endorsements, amendments, etc. in force at the time of the incident).

**RESPONSE:**

INTERROGATORY NO. 26: Have any of the insurers or indemnitors identified in your response to the preceding interrogatories denied in whole or in part coverage or indemnification for any of plaintiff's claims, or accepted defense of this action upon a reservation of rights? If so, please state as to each:

a. Name, address and telephone number of the insurer or indemnitor;
b. Contract language upon which the insurer or indemnitor bases its denial of coverage, indemnification or reservation of rights;
c. Reasons for the insurer's or indemnitor's denial of coverage, indemnification or reservation or rights.

ANSWER:

INTERROGATORY NO. 27: Pursuant to Civil Rule 26, please identify each person whom you expect to call as an expert at the time of trial. YOUR FAILURE TO FULLY AND TIMELY ANSWER THIS INTERROGATORY WILL RESULT IN PLAINTIFF OBJECTING TO THE USE OF SUCH EXPERT AT TIME OF TRIAL. As to each expert, please state:

a. Expert's full name, job title, address and telephone number;
b. Name, address and telephone number of expert's employer, if any;

**PLAINTIFFS' FIRST SET OF**
**INTERROGATORIES AND REQUESTS FOR**
**PRODUCTION OF DOCUMENTS TO**
**DEFENDANT WM. BOLTHOUSE FARMS, INC. 14**

SMART LAW OFFICES, P.S.
309 N. Delaware St./PO Box 7284
Kennewick WA 99336
509-735-5555/FAX 509-735-2073

1       c. Whether any written reports have been furnished by the expert to defendant and, if
           so, the dates thereof;

2       d. Subject matter on which the expert has been consulted or is expected to testify;
      e. Substance of the facts and opinions to which the expert is expected to testify;

3       f. A summary of the grounds for each opinion to which the expert is expected to testify;

4       g. A statement of the expert's qualifications to testify in this action.

5       ANSWER:

6

7

8       **REQUEST FOR PRODUCTION NO. 17:** Please produce a copy of all reports
identified in response to the preceding interrogatory.

9       **RESPONSE:**

10

11       **REQUEST FOR PRODUCTION NO. 18:** Please produce a copy of all documents,
emails and other data sent by defendant, their attorneys, agents or employees to each expert

12 identified by defendant in a preceding interrogatory.

13       **RESPONSE:**

14

15 INTERROGATORY NO. 28: Please identify by name, address, telephone number, employer

16 and job title each lay person you intend to call as a witness at trial and a summary of what they
will be testifying about.

17

18       ANSWER:

19

20       **REQUEST FOR PRODUCTION NO. 19:** Please produce a copy of each

21 photograph, motion picture, videotape, slide, drawing, diagram, map, or other graphic
representation pertaining to the subject matter of this lawsuit not previously identified

22 which you intend to offer into evidence at the time of trial.

23       **RESPONSE:**

24

25

26 **PLAINTIFFS' FIRST SET OF**
**INTERROGATORIES AND REQUESTS FOR**
**PRODUCTION OF DOCUMENTS TO**
**DEFENDANT WM. BOLTHOUSE FARMS, INC. 15**

**SMART LAW OFFICES, P.S.**
**309 N. Delaware St./PO Box 7284**
**Kennewick WA 99336**
**509-735-5555/FAX 509-735-2073**

**REQUEST FOR PRODUCTION NO. 20:** Please produce a copy of any and all written correspondence, which includes but is not limited to emails, letters, and memorandums, between you and any party to this action (or representative of a party to this action) which refers or relates to the subject matter of this lawsuit.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 21:** Please produce a copy of any and all written correspondence, which includes but is not limited to emails, letters, and memorandums, between you and any third party (or representative of a third party) which refers or relates to the subject matter of this lawsuit.

**RESPONSE:**

INTERROGATORY NO. 29: Please state the following in regard to the conveyor belt system in which plaintiff was injured at the time of the subject incident:

(a)     Designer of the system;
(b)     Manufacturer of the system;
(c)     Date of purchase or acquisition of system;
(d)     Name, business and contact information from whom system was purchased or acquired;
(e)     Date of any maintenance or alterations to system since its installation or acquisition;
(f)     Description of maintenance and/or alternations to system;
(g)     Person or entity who performed each type of maintenance or alteration to system; and
(h)     Cost of each item of maintenance;

ANSWER:

**REQUEST FOR PRODUCTION NO. 21:** Please produce a copy of all documents which substantiate your response to the preceding interrogatory (THIS IS MEANT TO

**PLAINTIFFS' FIRST SET OF**
**INTERROGATORIES AND REQUESTS FOR**
**PRODUCTION OF DOCUMENTS TO**
**DEFENDANT WM. BOLTHOUSE FARMS, INC. 16**

SMART LAW OFFICES, P.S.
309 N. Delaware St./PO Box 7284
Kennewick WA 99336
509-735-5555/FAX 509-735-2073

INCLUDE purchase orders, warranties, maintenance logs, maintenance billings, maintenance contracts, etc).

   **RESPONSE:**


   **REQUEST FOR PRODUCTION NO. 22:** Please produce a complete copy of all policies and procedures in effect at the Wm. Bolthouse Farms, Inc. location at the time of the subject incident.

   **RESPONSE:**


INTERROGATORY NO. 30: Please describe in detail any ownership interest or contractual duties the defendant or any other person or entity had in regard to the subject conveyor belt system on the date of the subject incident.

   ANSWER:


**REQUEST FOR PRODUCTION NO. 23:** Please produce a copy of all documents which substantiate the proceeding Interrogatory.

   **RESPONSE:**


INTERROGATORY NO. 31: In regard to the work and safety training plaintiff received at the Wm. Bolthouse Farms, Inc. location prior to the subject incident, please list:

   a. All dates of training;
   b. Name and contact information for each person who performed the training; and
   c. Substance of each training.

   ANSWER:


PLAINTIFFS' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO
DEFENDANT WM. BOLTHOUSE FARMS, INC. 17

SMART LAW OFFICES, P.S.
309 N. Delaware St./PO Box 7284
Kennewick WA  99336
509-735-5555/FAX 509-735-2073

**REQUEST FOR PRODUCTION NO. 24:** Please produce a copy of all documents which substantial the preceding Interrogatory.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 25:** Please produce a copy of any and all training materials used or furnished to train plaintiff by defendant prior to the subject incident.

**RESPONSE:**


INTERROGATORY NO. 32: If the subject conveyor belt system was formally inspected by defendant, any employee or agent of the defendant, or any insurer, government entity, or otherwise for any reason in the five years prior to the subject incident, please list:

    a. Each date inspected;
    b. Name and contact information of inspector;
    c. Reason for inspection; and
    d. Outcome of inspection.

    ANSWER:


**REQUEST FOR PRODUCTION NO. 26:** Please produce a copy of all documents which substantiate the preceding interrogatory.

**RESPONSE:**


INTERROGATORY NO. 33: For each and every alteration or change made to the subject conveyor belt system in the 10 years prior to the subject incident please list:

    a) Alteration or change made;

**PLAINTIFFS' FIRST SET OF**
**INTERROGATORIES AND REQUESTS FOR**
**PRODUCTION OF DOCUMENTS TO**
**DEFENDANT WM. BOLTHOUSE FARMS, INC. 18**

**SMART LAW OFFICES, P.S.**
**309 N. Delaware St./PO Box 7284**
**Kennewick WA 99336**
**509-735-5555/FAX 509-735-2073**

b) Date it was made;
c) Who it was made by;
d) At whose request it was done;
e) Where it was made;
f) Why it was made; and
g) Cost for alteration or change.

ANSWER:

**REQUEST FOR PRODUCTION NO. 27:** Please produce a copy of all documents which substantiate the preceding interrogatory.

**RESPONSE:**

INTERROGATORY NO. 34: For each and every alteration or change made to the subject conveyor belt system <u>since</u> the subject incident please list:

a) Alteration or change made;
b) Date it was made;
c) Who it was made by;
d) At whose request it was done;
e) Where it was made;
f) Why it was made; and
g) Cost for alteration or change.

ANSWER:

**REQUEST FOR PRODUCTION NO. 28:** Please produce a copy of all documents which substantiate the preceding interrogatory.

**RESPONSE:**

PLAINTIFFS' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO
DEFENDANT WM. BOLTHOUSE FARMS, INC. 19

SMART LAW OFFICES, P.S.
309 N. Delaware St./PO Box 7284
Kennewick WA 99336
509-735-5555/FAX 509-735-2073

**REQUEST FOR PRODUCTION NO. 29:** Please produce a copy of any photographs or video in your possession or that in the possession of any of your agents, employees, insurers or clients which accurately depict the area where the subject incident occurred at the time of the occurrence or shortly thereafter.

**RESPONSE:**

INTERROGATORY NO. 35: Please describe any lock-out, tag-out policy or procedure (de-energizing of the conveyor belt system) in effect at the time of the incident regarding the subject conveyor belt system.

ANSWER:

**REQUEST FOR PRODUCTION NO. 30:** Please produce a copy of all documents which substantiate the preceding interrogatory.

**RESPONSE:**

INTERROGATORY NO. 36: Please describe any changes to the lock-out, tag-out policy or procedure (de-energizing of the conveyor belt system) since the incident on July 15, 2015 regarding the subject conveyor belt system.

ANSWER:

**REQUEST FOR PRODUCTION NO. 31:** Please produce a copy of all documents which substantiate the preceding interrogatory.

**RESPONSE:**

PLAINTIFFS' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO
DEFENDANT WM. BOLTHOUSE FARMS, INC. 20

SMART LAW OFFICES, P.S.
309 N. Delaware St./PO Box 7284
Kennewick WA 99336
509-735-5555/FAX 509-735-2073

1    INTERROGATORY NO. 37: Please describe any changes to the work and safety
     training by defendant of sanitation workers since the incident on July 15, 2015 regarding
2    the subject conveyor belt system.

3

4    ANSWER:

5

6

7    REQUEST FOR PRODUCTION NO. 32: Please produce a copy of all documents
     which substantiate the preceding interrogatory.
8

9    RESPONSE:

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# CERTIFICATION

The undersigned certifies under penalty of perjury under the laws of the State of Washington that the following is true and correct:

That I am the Defendant in the above-entitled action, that I have read the within and foregoing First Interrogatories and Request for Production to Defendant and answers thereto, know the contents thereof, and believe the same to be true.

DATED this _____ day of _____, 2018.

By:_____
Print Name:_____
Defendant _____

The undersigned attorney for the Defendant has read the foregoing First Set of Interrogatories and Request for Production to Defendant and the answers, responses or objections made thereto and they are in compliance with CR 26 (g).

Dated this ____ day of _____, 2018.

_____
WSBA #_____
Attorney for Defendants

**PLAINTIFFS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT WM. BOLTHOUSE FARMS, INC. 22**

**SMART LAW OFFICES, P.S.**
309 N. Delaware St./PO Box 7284
Kennewick WA 99336
509-735-5555/FAX 509-735-2073

1

2

3

4

5

6

7

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF BENTON

DAVID LICONA LARA, a single person,

             Plaintiff,

vs.

WM. BOLTHOUSE FARMS, INC., a
SUBSIDIARY OF CAMPBELL SOUP CO., a
foreign corporation; XYZ CORPORATIONS;
and JANE DOE and JOHN DOE
EMPLOYEES 1-10,

             Defendants.

Cause No.: 18-2-00978-0

**PLAINTIFFS' FIRST REQUESTS
FOR ADMISSIONS TO DEFENDANT
WM. BOLTHOUSE FARMS, INC.**

TO:       **WM. BOLTHOUSE FARMS, INC.**

      These are requests for admissions served upon you in accordance with Civil Rules 36 and

37. Please respond to each of the following requests separately and fully under oath within thirty

days of the date of service. Please type responses in the spaces provided, adding pages if

additional space is required. Return the original requests for admissions to this office and serve a

copy upon all other parties. These requests for admissions are directed to the above named party

or parties and to their attorneys, and extend to all information of said party or parties, their

attorneys, their liability insurers, and their attorneys' and liability insurers' agents.

      If you do not admit or deny a matter, you must set forth in detail pursuant to the Civil

Rules the reasons why you cannot truthfully admit or deny the matter. If objection is made to

PLAINTIFF'S FIRST REQUESTS FOR
ADMISSIONS TO DEFENDANT
WM. BOLTHOUSE FARMS, INC. - 1

SMART LAW OFFICES, P.S.
309 N. Delaware St./PO Box 7284
Kennewick WA 99336
509-735-5555/FAX 509-735-2073

1    any request for admission, you must set forth in detail pursuant to the Civil Rules the reason and

2    basis for the objection.

3

   DATED this __12__ day of April, 2018.

4

5                          SMART LAW OFFICES, PS

6

7

8                          Mistee R. Verhulp, WSBA 29351
                         Attorney for Plaintiff

9

10                 **PLAINTIFF'S FIRST REQUESTS FOR ADMISSION**

11

12    REQUEST FOR ADMISSION NO. 1:   Admit that service of process has been properly

13    effectuated on defendant Wm. Bolthouse Farms, Inc.

14

15        ADMIT OR DENY:

16

17    REQUEST FOR ADMISSION NO. 2: Admit that on July 15, 2015, defendant Wm. Bolthouse

18    Farms, Inc. was a subsidiary of Campbell Soup Company.

19

20        ADMIT OR DENY:

21

22    REQUEST FOR ADMISSION NO. 3: Admit that defendant Wm. Bolthouse Farms, Inc., as a

23    subsidiary of Campbell Soup Company, was the sole operator of business being conducted at the

   Wm. Bolthouse Farms, Inc. location of 10 Sonova Road in Prosser, Washington on July 15,

24    2015.

25

26        ADMIT OR DENY:

PLAINTIFF'S FIRST REQUESTS FOR
ADMISSIONS TO DEFENDANT
WM. BOLTHOUSE FARMS, INC. - 2

1

2    REQUEST FOR ADMISSION NO. 4: Admit that on July 15, 2015, plaintiff David Licona Lara

3    was an employee of Atkinson Staffing, Inc. working at the Wm. Bolthouse Farms, Inc. location

4    of 10 Sonova Rd in Prosser, Washington.

5        ADMIT OR DENY:

6

7

8    REQUEST FOR ADMISSION NO. 5:  Admit that defendant Wm. Bolthouse Farms, Inc. did its

9    own maintenance on the equipment and machinery at its business located at 10 Sonova Road in

10   Prosser, Washington prior to July 15, 2015.

11       ADMIT OR DENY:

12

13

14   REQUEST FOR ADMISSION NO. 6:  Admit that defendant Wm. Bolthouse Farms, Inc. made

15   alterations to the conveyor belt system at its business located at 10 Sonova Road in Prosser,

16   Washington prior to July 15, 2015.

17       ADMIT OR DENY:

18

19

20   REQUEST FOR ADMISSION NO. 7:  Admit that defendant Wm. Bolthouse Farms, Inc.

21   required the conveyor belt system at its business located at 10 Sonova Road in Prosser,

22   Washington be left on and running on July 15, 2015 until sanitation laborers had completed

     cleaning and sanitizing their section of the conveyor belt system.

23       ADMIT OR DENY:

24

25

26

**PLAINTIFF'S FIRST REQUESTS FOR**
**ADMISSIONS TO DEFENDANT**
**WM. BOLTHOUSE FARMS, INC. - 3**

**SMART LAW OFFICES, P.S.**
**309 N. Delaware St./PO Box 7284**
**Kennewick WA 99336**
**509-735-5555/FAX 509-735-2073**

REQUEST FOR ADMISSION NO. 8: Admit that on July 15, 2015, at its business located at 10 Sonova Road in Prosser, Washington, defendant Wm. Bolthouse Farms, Inc. did not provide every sanitation laborer working on the conveyor belt system with their own lock and own key for the conveyor belt system.

    ADMIT OR DENY:


REQUEST FOR ADMISSION NO. 9: Admit that plaintiff David Licona Lara sustain injuries as a result of the subject incident which took place at 10 Sonova Road in Prosser, Washington on July 15, 2015.

    ADMIT OR DENY:


REQUEST FOR ADMISSION NO. 10: Admit that no persons or entities not currently named as a party to this lawsuit are legally responsible for causing the July 15, 2015 incident which is the subject of this action.

    ADMIT OR DENY:


## VERIFICATION

    I declare under penalty of perjury under the laws of the State of Washington that I have read the foregoing responses to Plaintiff's Requests for Admissions, know the contents thereof, and believe them to be true and correct.


    DATED this _____ day of _____, 2018.


       By:_____
       Print Name:_____
       For Defendant Wm. Bolthouse Farms, Inc.

**PLAINTIFF'S FIRST REQUESTS FOR
ADMISSIONS TO DEFENDANT
WM. BOLTHOUSE FARMS, INC. - 4**

**SMART LAW OFFICES, P.S.
309 N. Delaware St./PO Box 7284
Kennewick WA 99336
509-735-5555/FAX 509-735-2073**

## ATTORNEY'S CR 26 CERTIFICATION

The undersigned attorney certifies pursuant to Civil Rule 26(g) that he has read each response and objection to these requests for admissions, and that to the best of his knowledge, information, and belief formed after a reasonable inquiry, each is (1) consistent with the Civil Rule and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; (2) not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the costs of litigation; and (3) not unreasonable or unduly burdensome or expensive, given the needs of the case; the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation.

Dated this ____ day of _____, 2018.


_____
Attorney for Defendants

.

**SMART LAW OFFICES, P.S.**
309 N. Delaware St./PO Box 7284
Kennewick WA 99336
509-735-5555/FAX 509-735-2073

1

2

3

4

5

6

7                    IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
                              IN AND FOR THE COUNTY OF BENTON
8

9

10   DAVID LICONA LARA, a single person,

11                    Plaintiff,                    Cause No.: 18-2-00978-0

     vs.
12

13   WM. BOLTHOUSE FARMS, INC., a          REQUEST FOR INSPECTION
     SUBSIDIARY OF CAMPBELL SOUP CO., a
14   foreign corporation; XYZ CORPORATIONS;
     and JANE DOE and JOHN DOE
15   EMPLOYEES 1-10,

16                    Defendants.

17   TO:        WM. BOLTHOUSE FARMS, INC.

18           COMES NOW the Plaintiff, by and through his attorney of record, Mistee R. Verhulp and

19   SMART LAW OFFICES, P.S., and requests an inspection of the WM. Bolthouse Farms, Inc.

20   location where the incident giving rise to this lawsuit took place on July 15, 2015, the scope of

21   which is as follows:

22
             Inspection of the premises at a mutually agreed upon date and time by no
23       more than five persons designated by the Plaintiff who shall have general
         access to the inside of the building; the conveyor belt system that was being
24       being cleaned and sanitized when the incident occurred; the company issued
         clothing and cleaning gear that plaintiff was wearing when the subject
25       incident occurred or an accurate example representation of the same; any
         computerized, electronic or energized system which in any way controls or
26       powers the subject conveyor belt systems; and all areas above, below and

REQUEST FOR INSPECTION - 1                          SMART LAW OFFICES, P.S.
                                                    309 N. Delaware St./PO Box 7284
                                                    Kennewick WA  99336
                                                    509-735-5555/FAX 509-735-2073

around the subject conveyor belt system. The plaintiff's designated inspectors shall be allowed to take photographs, measurements, and/or videotape during their inspection. <u>The defendants shall designate a representative to show plaintiff's designated inspectors how the conveyor belt system and its components are turned on, turned off, and programed during the inspection.</u> The plaintiff's designated inspectors shall be allowed to have physical contact with any equipment, computers or other tangible items in the designated areas. The plaintiff's designated inspectors shall not disassemble or otherwise permanently alter any equipment during the inspection.

DATED this ____ day of _____, 2018.

Mistee R. Verhulp, WSBA #29351
Attorney for Plaintiff Licona Lara

SMART LAW OFFICES, P.S.
309 N. Delaware St./PO Box 7284
Kennewick WA 99336
509-735-5555/FAX 509-735-2073

EXHIBIT D

**Dennis Gallagher**

| | |
|---|---|
| **From:** | Volock Jr,John E <JVOLOCK@travelers.com> |
| **Sent:** | Thursday, May 10, 2018 8:46 AM |
| **To:** | claim@music-ins.com |
| **Cc:** | Walt Connor; Todd Hutchison |
| **Subject:** | Claim tender by William Bolthouse Farms under Mesa policy MP0036002002040 |
| **Attachments:** | Attachment.pdf; 2015 Atkinson Staffing Contract 06 02 15 to 06 01 16_324396(3).PDF; Lara lawsuit against Bolthouse.pdf |

Wm. Bolthouse Farms, Inc. ("WBF"), a wholly-owned indirect subsidiary of Campbell Soup Company, is formally tendering its defense and indemnity to Mesa Underwriters and Atkinson Staffing for the lawsuit filed against WBF and other unnamed defendants by a temporary staffer loaned to WBF for work at WBF's Prosser, Washington plant. Mr. Lara disregarded training, entered an area of the plant where he was not authorized to be, and engaged in unauthorized activities at the time he sustained allegedly serious injuries. Atkinson agreed to indemnify and defend WBF for any claim, suit or demand arising out of Atkinson's performance under the contract or by reason of any act or omission by Atkinson or any of its employees. Atkinson also agreed to—and did—name WBF as an additional insured under Atkinson's general liability policy with Mesa. For ease of reference, I've attached a copy of the Atkinson Staffing contract, the COI naming WBF as an additional insured and a copy of Mr. Lara's lawsuit.

Time is of the essence as an answer needs to be filed without delay (the current deadline is Monday, May 14). WBF is tendering this demand as both an additional insured on a primary non-contributory basis (Para 20 of the Atkinson contract) and as a contractual indemnitee under Atkinson's general liability policy (para 19).

I would respectfully ask this tender be accepted without delay so appropriate measures may be taken to protect WBF's interests in this lawsuit. Time is of the essence as an answer needs to be filed without delay. WBF is tendering this demand as both an additional insured on a primary non-contributory basis (Para 20 of the Atkinson's contract) and as a contractual indemnitee under Atkinson's general liability policy (para 19).

I would respectfully ask this tender be accepted without delay so appropriate measures may be taken to protect WBF's interests in this lawsuit.

Sincerely,

John E Volock Jr | Claim Professional
Travelers
PO Box 173798
Denver, Co 80217
Phone: 720-963-7298
Cell: 505-379-1773
Fax: 1-877-803-1405
How am I doing? Please contact my manager, James Miller (jvmiller@travelers.com) with any comments or suggestions.

This message (including any attachments) may contain confidential, proprietary, privileged and/or private information. The information is intended to be for the use of the individual or entity designated above. If you are not the intended recipient of this message, please notify the sender immediately, and delete the message

and any attachments. Any disclosure, reproduction, distribution or other use of this message or any attachments by an individual or entity other than the intended recipient is prohibited.

EXHIBIT E



Rob Byrne, CPCU, AIC, SCLA
PO Box 7271
London, KY  40742
Tel: 317-815-4317   Fax: 317-815-4346
E-mail: Robert.byrne@selective.com

May 14, 2018

Travelers                                   *(sent via email and regular mail)*
Attn: John E Volock, Jr.
PO Box 173798
Denver, CO  80217

RE:   Our Insured:          Atkinson Staffing, Inc.
      Lawsuit:              *David Licona Lara, Etc., Plaintiff vs. Wm. Bolthouse Farms, Inc., Etc., et al,*
                            *Defendants,* filed in the Benton County Superior Court, State of Washington,
                            under case # 182009780.
      Our Claim Number:     21860133
      Date of Loss:         July 15, 2015
      Policy Number:        MP0036002002040 (effective 1/27/2015 to 1/27/2016)
      Insurance Company:    Mesa Underwriters Specialty Insurance Company

Dear Mary Volock, Jr.,

Mesa Underwriters Specialty Insurance Company ("MUSIC"), the insurer for Atkinson Staffing, Inc. (Atkinson), has received your e-mail dated May 10, 2018, requesting that we assume the defense and indemnity for claims made by the plaintiff against your insured, William Bolthouse Farms, Inc. ("WBF") in the above referenced lawsuit. At this time, we must respectfully decline your request that MUSIC provide a defense and/or indemnification of WBF. In this letter, MUSIC will further explain our reasons for our denial of WBF's tender for defense and indemnification.

**LAWSUIT/FACTS:**

The Plaintiff's original petition ("Complaint") was filed on April 16, 2018 against WBF and other defendants ("Defendants", collectively) in the Benton County Superior Court, State of Washington, under cause #18-2-00978-0. The complaint alleges, in part, damages as a result of negligence, including negligent training and supervising its employees by Defendants. According to the Complaint, WBF contracted with Atkinson to provide temporary laborers at one or more of its business locations in Benton County, Washington. David Licona Lara (hereafter "Lara" or "Plaintiff") alleges that he was an employee of Atkinson in July of 2015. On or about July 7, 2015, Atkinson sent Lara to work at one of WBF's business locations in Prosser, Benton County, Washington. It is further alleged that Lara was assigned by one or more Defendants to do sanitation work on a portion of a conveyor belt system with a pick wheel, and was trained to leave the conveyor belt system on when performing sanitation work on the portion of the conveyor belt system he was assigned. On or about July 15, 2015, it is alleged that the yellow jacket

provided by Defendants and which Lara was wearing at the time, got caught on the pick wheel at a pinch point in the conveyor belt system while performing sanitation work on the portion of the conveyor belt system he was assigned. It is alleged that Lara was pulled into the conveyor belt system and sustained serious bodily injury before an emergency stop button could be located and pushed by another laborer.

**COMMERCIAL GENERAL LIABILITY POLICY:**

MUSIC issued a Commercial General Liability policy to Atkinson with a policy term effective from January 27, 2015 to January 27, 2016 under policy MP0036002002040. The Primary Liability Limits of the policy are $1,000,000 per Occurrence with a $2,000,000 General Aggregate. The policy limit for Personal and Advertising Injury is $1,000,000 per occurrence.

**ANALYSIS:**

WBF is an additional insured under the Policy by virtue of Endorsement CG 20 10 0413, entitled "Additional Insured – Owners, Lessees or Contractors – Scheduled Person or Organization" (Additional Insured Endorsement). It identifies William Bolthouse Farms, Inc. & Its Subsidiaries as additional insureds. A copy of the endorsement is attached for your reference.

Endorsement CG 20 10 0413 further provides as follows:

> **A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury," "property damage" or "personal and advertising injury" caused, in whole or in part, by:
>
> 1. Your acts or omissions; or
>
> 2. The acts or omissions of those acting on your behalf; in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

The Additional Insured Endorsement provides that WBF is an additional insured under the Policy.

MUSIC acknowledges that the accident or occurrence as described in the complaint resulted in bodily injury. This would be an occurrence that falls under the Insuring Agreement for **Coverage A – Bodily Injury and Property Damage Liability**. But it is our position that none of the allegations or claims fall within the insuring agreement for **Coverage B- Personal and Advertising Injury Liability**. In order for MUSIC to determine conclusively, however, whether coverage applies for the loss under the **Commercial General Liability Coverage form;** it is also necessary to review the policy *Exclusions* which list those items for which coverage is specifically not provided. In particular, the Atkinson policy has an endorsement titled **LIMITED COVERAGE FOR CONTRACTORS AND EMPLOYEES (General Liability)** (MUS 01 01 20007 1013). This form states in relevant part:

# LIMITED COVERAGE FOR CONTRACTORS AND EMPLOYEES
## (General Liability)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

A. SECTION 1 – COVERAGE A BODILY INJURY AND PROPERTY DAMAGE, 2. Exclusions, is deleted and replaced as follows:

This Insurance does not apply to:

e. Employer's Liability

"Bodily Injury" to:

(1) An "employee", "temporary worker", "leased employee", or independent contractor of the insured or any additional insured or employee of any independent contractor arising out of and in the course of:

(a) Employment by the insured or any additional insured or independent operator

(b) Performing duties related to the conduct of the insured or any additional insured's business; or

(c) Arising out of the injured party's employment; or

(2) A fellow "employee", "temporary worker", "leased employee", or independent contractor of the insured or any additional insured arising out of the course of such employment when the insured is an "executive officer" of such employer: or…

This exclusion applies:

(1) Whether an insured may be liable as an employer or in any other capacity;

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury; or

(3) To any liability assumed under any contract or agreement.

Lara was an employee of Atkinson, and his claim is for bodily injury arising out of and in the course of: (a) his employment by Atkinson, (b) while performing duties related to the conduct of Akinson's business and/or WBF's (Additional Insured) business, and (c) arising out of Lara's employment.

The complaint alleges that the claimant was acting in the scope of employment for Atkinson and Lara was an employee of Atkinson at the time that injury occurred to Lara. Bodily injury to an employee, contractor, "temporary worker" and any person performing work related to the conduct of any insured's business is excluded under this endorsement.

Consequently, based upon the aforementioned exclusion, the loss falls outside of Coverage A. And, as stated earlier, it is our position that none of the allegations or claims fall within the insuring agreement for Coverage B. Therefore, there is no coverage for the defense or indemnity of this loss.

For the reasons discussed, we must respectfully deny the tender of defense and indemnity at this time for WBF. The liability insurance coverage granted under Atkinson's policy with MUSIC is subject to coverage exclusions for the claims and/or damages related to the incident and Complaint, which also bars coverage for any entities/individuals who qualify as Additional Insureds under the same policy.

MUSIC further reserves the right to assert additional reasons for disclaiming any duty to defend and/or indemnify WBF based upon the terms, conditions and exclusions contained in the insurance contract and/or based upon law or fact. Nothing contained herein shall be deemed a waiver of MUSIC's right to assert additional grounds for disclaiming coverage, whether now known or discovered in the future. The failure to reserve here any reason for disclaiming coverage should not be deemed a waiver by MUSIC of that reason or basis. By not mentioning other provisions and conditions of the insurance contract, MUSIC does not waive them and the entire insurance contract is referenced as if set forth in full herein.

Should you have further information or the details that you feel may change our position, please provide same for my review and consideration.

Sincerely,

Robert Byrne, CPCU, AIC, SCLA
Mesa Underwriters Specialty Insurance Company


Cc:     Atkinson Staffing

Cc:     Hull & Company, Inc.

EXHIBIT F

# MURRAY, DUNHAM & MURRAY

ATTORNEYS AT LAW

*Seattle Office*
William W. Spencer
Jennifer P. Murray
Elizabeth A. Freiberg
Jason E. Soderman

Mailing Address:
Post Office Box 9844
Seattle, WA 98109-0844
Street Address:
200 West Thomas, Ste. 350
Seattle, WA  98119

Main: (206) 622-2655
Fax: (206) 684-6924

*Mercer Island office*
Michael Taylor

Street/Mailing Address:
8015 SE 28th Street, Ste. 301
Mercer Island, WA  98040

Main: (206) 708-6162
Fax: (206) 708-6729

May 31, 2018

**VIA EMAIL: m.atkinson@atkinsonstaffing.com**
Mr. Michael Atkinson
Atkinson Staffing
2505 West Sylvester Street
Pasco, WA  93301

> Re:    **Lara v. Wm. Bolthouse Farms, Inc.**

Dear Mr. Atkinson:

This firm represents Wm. Bolthouse Farms, Inc. in a personal injury lawsuit filed on behalf of David Lara in Benton County, Washington. A copy of the Complaint is attached for your reference. The Complaint alleges that David Lara was an employee of Atkinson Staffing and had been sent by your company to Wm. Bolthouse Farms to provide sanitation work on a portion of a conveyor belt system with a pick wheel. Unfortunately, Plaintiff's clothing got caught on the pick wheel and Mr. Lara was pulled into the conveyor belt system and now claims serious injuries.

On June 2, 2015 Atkinson Staffing entered into a Services Agreement with my client. Under the terms of the agreement, Atkinson Staffing was required to obtain insurance and name my client as an additional insured under the general liability policy (see section 20). The defense and indemnity of Wm. Bolthouse Farms was previously tendered to Mesa Underwriters Specialty Insurance Company, the insurer for Atkinson Staffing. While acknowledging my client was an additional insured under the policy, the tender was declined on the basis that there was an exclusion for bodily injury to an employee or leased employee of the insured or any additional insured.

The Services Agreement also had an Indemnification provision (see section 19) which states in part as follows:

> Vendor will indemnify, defend, and hold Company and its affiliates harmless against any and all costs, losses, damages or expenses (including reasonable attorney's fees) that any of them may incur or be subjected to by reason of any claim, demand, or suit arising out of Vendor's performance of the Services set forth in this Agreement, or by reason of any act or admission of Vendor or any of its employees, contractors or agents.

The defense and indemnity of Wm. Bolthouse Farms is hereby tendered to Atkinson Staffing. The lawsuit and claim clearly arise out of an act performed by Mr. Lara who is alleged to be an employee of Atkinson Staffing. Under the terms of the indemnification provision, Atkinson Staffing is required to defend and indemnify my client against all claims of Mr. Lara.

Please accept this tender without delay in order to protect the interests of my client in this lawsuit. If the tender is not accepted, we will have no choice but to file a claim for breach of contract. I look forward to your response. Please do not hesitate to contact me if you have any questions or need further information.

Yours truly,

William W. Spencer

WWS/tlb
cc:     Ms. Amanda Gomez
        (via email: a.gomez@atkinsonstaffing.com)

EXHIBIT G



STOKES LAWRENCE
VELIKANJE MOORE & SHORE

Brendan V. Monahan
(509) 853-3000
brendan.monahan@stokeslaw.com

*Reply to Yakima Office*

December 3, 2018

**_VIA EMAIL—william@murraydunham.com_**
William Spencer, Esq.
Murray Dunham & Murray
P.O. Box 9844
Seattle, WA 98109-0844

     Re:    Lara v. Wm. Bolthouse Farms, Inc.

Dear Mr. Spencer:

My apologies for the delays associated with responding to your letter of May 31, 2018. In such letter you formally tendered to Atkinson Staffing the "defense and indemnity of Wm. Bolthouse Farms" for the claims being asserted by David Lara.

The tender of defense and indemnity is respectfully declined.

First and foremost, Atkinson Staffing promised only to defend and indemnify against claims "arising out of (Atkinson's) performance of the Services set forth in this Agreement, or by a reason of any act or omission of (Atkinson) or its employees, contractors or agents". Mr. Lara is suing Bolthouse under a theory that Bolthouse's negligence caused his injuries. Such claims would not appear to be covered by the contractual indemnity provisions.

I would also recommend to you the line of cases that include *Novenson v. Spokane Culvert & Fabricating Co.*, 91 Wn.2d 550, 553, (1979) (citing *Marsland v. Bullitt Co.*, 71 Wn.2d 343 (1967) and *Fisher v. City of Seattle*, 62 Wn.2d 800, 384 P.2d 852 (1963), which address whether and when a company that utilizes the services of a temp agency may enjoy the employer-immunity provided under RCW 51.04.010. (Note: the test for immunity under the loaned duty doctrine in California, the law of which governs the interpretation of the contract, appears to be somewhat more favorable to the contracting employer. *See Kowalski v. Shell Oil Co.*, 23 Cal.3d 168, 174 (1979).

54146-001 \ 2493825.docx

120 N. Naches Avenue | Yakima, Washington 98901-2757 | 509.853.3000
1420 Fifth Avenue, Suite 3000 | Seattle, Washington 98101-2393 | 206.626.6000
www.stokeslaw.com

Finally, even if Bolthouse is unable to satisfy the burdens that would afford it immunity, I understand you may be aware that Bolthouse is an additional named insured on Atkinson's commercial liability policy. I have enclosed documents relating to such policy and I would encourage you to contact the insurer to discuss the extent to which Mr. Lara's claims may be covered by this insurance.

Please do call me if you have any other questions or concerns.

Very truly yours,

STOKES LAWRENCE
VELIKANJE MOORE & SHORE

Brendan V. Monahan

Enclosures
cc: Michael Atkinson